Raymond E. PRYOR, Personal Representative of the Estate of Marion L. Stephens, Deceased, Appellant,

v.

**AMERICAN PRESIDENT LINES, Appellee.**

No. 74–1699.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 5, 1975.

Decided March 17, 1975.

Certiorari Denied Jan. 12, 1976. See 96 S.Ct. 787.

Joseph F. Lentz, Jr., Baltimore, Md., for appellant.

John T. Ward, Baltimore, Md. (Ober, Grimes & Shriver, Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and CRAVEN and WIDENER, Circuit Judges.

CRAVEN, Circuit Judge:

We heard this case on February 5, 1975, and released our slip opinion on March 17, 1975. We held that if defectively packaged goods in a railroad car on a pier are released by action of a ship's winch so as to cause injury, there exists a sufficiently close causal relationship between operation of the ship's gear and the injury to invoke the admiralty doctrine of unseaworthiness. On petition for rehearing by American President Lines, we withdraw our prior opinion. We are now convinced that the law of admiralty has no application to the facts of this case, and that the claim of unseaworthiness is therefore untenable. For reasons that will be more fully stated, the decision of the district court dismissing the complaint will be affirmed.

### I.

On September 12, 1969, Marion L. Stephens, a longshoreman employed by the Nacirema Operating Company, was injured while helping load coils of steel wire from a railroad gondola car onto the S. S. PRESIDENT PIERCE at the Pennwood Wharf in Baltimore. The coils had been stowed in the gondola car in three rows, two on bottom and the third on top of those two in pyramid formation. Stephens' job was to run a wire through the center holes of several coils and hook the eyes at the ends of the wire to the ship's cargo cable so that the ship's winch could lift the coils on board. He allegedly was injured when a coil of wire that he had not yet touched, sprang open just as the coils next to it were being lifted away by the winch. It is claimed that the jagged end of the coil caught Stephens' trouser leg and knocked him off the gondola car.

Stephens sued the shipowner, American President Lines, alleging unseaworthiness and negligence. He invoked the admiralty jurisdiction of the district court, 28 U.S.C. § 1333(1); see Fed.R. Civ.P. 9(h), but also alleged diversity of citizenship, which the defendant specifically admitted. Since the ad damnum was $50,000 the district court had jurisdiction under 28 U.S.C. § 1332 as well.

The case proceeded on the admiralty side of the court and was tried to the judge without a jury. The only evidence on the circumstances of the injury was Stephens' pre-trial deposition, introduced because Stephens had since died from an unrelated accident. At the close of plaintiff's case the defendant shipowner moved for dismissal under Rule 41(b). The district court, in an oral opinion, determined that it had admiralty jurisdiction, but found that the facts showed neither negligence nor unseaworthiness and dismissed the case. It found no evidence whatsoever of negligence, and plaintiff has not pressed that theory on appeal. As to unseaworthiness, it found no indication of a defect in the ship's gear and nothing unsafe about the plan of operation, and failed to find anything wrong with the coils. Further, the court stated that even had there been shown "some defective condition of the cargo, such as improper banding of the coils, or nonexistent banding of the coils," the unseaworthiness claim would still fail for lack of proof that the ship had "accepted" and thus become responsible for the coil that injured Stephens.

### II.

A federal maritime claim may be asserted in federal district court either under § 1333, or, in consequence of the "saving to suitors" clause of that section, based on diversity of citizenship.[1]

---

1. Section 1333 reads, in relevant part:

    The district courts shall have original jurisdiction, exclusive of the courts of the States, of:

    (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.

Because defendant admitted facts in the court below that showed diversity jurisdiction, we find it unnecessary to address the question of whether the court was correct in determining that it had jurisdiction under § 1333. For, as the Supreme Court noted in *Victory Carriers, Inc. v. Law*, 404 U.S. 202, 204, 92 S.Ct. 418, 420, 30 L.Ed.2d 383 (1971), "under either section the claim that a ship or its gear was unseaworthy would be rooted in federal maritime law." The dispositive question, therefore, is not jurisdictional but whether maritime law applies to this claim.

■■ The application of federal maritime law to alleged torts, whether negligence or unseaworthiness, has been governed historically by the locality of the harm. *Victory Carriers, supra*, at 205, 92 S.Ct. 418 and cases cited at n. 2; *but cf. Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (suggesting that some relationship to traditional maritime activity must be shown in addition to "maritime locality"). Maritime law has been applied, in general, only to torts occurring on navigable waters, with the result in the case of injuries occurring on or about docked ships that "[t]he gangplank has served as a rough dividing line between the state and maritime regimes." *Victory Carriers, supra*, at 207, 92 S.Ct. at 422.

■■ The reach of federal maritime law depends upon the content of Art. III, § 2, cl. 1 of the Constitution, and must be defined by the courts as arbiters of that document. But the Supreme Court, deferring to the Congress, *see Executive Jet, supra*, at 272–74, 93 S.Ct. 493; *Victory Carriers, supra*, at 211–12, 216, 92 S.Ct. 418, has upheld congressional extensions so long as they do not transgress those ultimate "boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot be altered by legislation." *Panama R. R. v. Johnson*, 264 U.S. 375, 386, 44 S.Ct. 391, 394, 68 L.Ed. 748 (1924); *see also The Propeller Genesee Chief v. Fitzhugh*, 53 U.S. (12 How.) 443, 453–58, 13 L.Ed. 1058 (1851).[2] Thus, although the Court had earlier refused to permit recovery in admiralty for damage caused by a ship to persons or property on shore, *see Martin v. West*, 222 U.S. 191, 32 S.Ct. 42, 56 L.Ed. 159 (1911); *The Troy*, 208 U.S. 321, 28 S.Ct. 416, 52 L.Ed. 512 (1908); *The Plymouth*, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1866), it allowed recovery for such an injury after Congress had passed the Admiralty Extension Act of 1948, 46 U.S.C. § 740, which states:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property,

The phrase "saving to suitors in all cases all other remedies" has been interpreted to mean that maritime law can be applied on the civil side of federal district court, *see Victory Carriers, Inc. v. Law*, 404 U.S. 202, 204, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971); *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 410–11, 74 S.Ct. 202, 98 L.Ed. 143 (1953), or even in state court, *see Romero v. International Terminal Operating Co.*, 358 U.S. 354, 361–63, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). *See generally* G. Gilmore & C. Black, The Law of Admiralty 33–36, 374–85 (1957); H. Hart & H. Wechsler, The Federal Courts and the Federal System 906–07 (2d ed. 1973).

2. U.S.Const. Art. III, § 2:

> The judicial Power shall extend . . . to all Cases of admiralty and maritime Jurisdiction.

> Although that clause appears on its face to be nothing more than a grant of jurisdiction

empowering the federal courts to entertain admiralty suits, it has been interpreted in addition both as empowering federal courts to draw on and develop the substantive admiralty law and as empowering Congress to revise and supplement that law within constitutional limits as defined by the Supreme Court. *See Romero v. International Terminal Operating Co.*, 358 U.S. 354, 360–61, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). All three of these aspects of the constitutional grant have been discussed by the courts, usually indiscriminately, under the rubric of "admiralty jurisdiction." Since the district court here had jurisdiction under § 1332 whether or not it did under § 1333, we deal in the opinion with only the latter two aspects—the substantive content and reach of admiralty law as delineated by the courts and by Congress. *Cf. Mascuilli v. American Export Isbrandtsen Lines, Inc.*, 381 F.Supp. 770, 773 & n. 5 (E.D.Pa.1974).

caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

In *Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), the Court held that a longshoreman on the dock could recover on a claim of unseaworthiness when he slipped on loose beans that had spilled from defective bags as they were being unloaded from a ship. *See Victory Carriers, supra,* at 210–11, 92 S.Ct. 418 (interpreting the holding of *Gutierrez* as dependent upon the Admiralty Extension Act); 7A J. Moore, Federal Practice ¶ .325 (Supp.1973), at 106. Thus, because Congress had acted within the "boundaries . . . which inhere in" the maritime law, *supra,* the maritime law extended in *Gutierrez* to the shoreward side of the gangplank.

In *Victory Carriers,* however, the Court refused to permit a maritime suit by a longshoreman injured during the loading process when the overhead protection rack of his forklift, owned by his stevedoring company, came loose and fell on him. The Court stated that "in the absence of congressional guidance," 404 U.S. at 204, 92 S.Ct. at 421, maritime law would not be extended any farther beyond the gangplank than is authorized by the Admiralty Extension Act, and specifically that it would not cover any injury to a longshoreman simply because he was engaged in the process of loading a ship. *Id.* at 211, 214 & n. 14, 92 S.Ct. 418.

■ After *Gutierrez* and *Victory Carriers* it is clear that maritime law does not reach an injury occurring off a ship that is being loaded or unloaded, *i. e.,* shoreward of the gangplank, unless the ship or some appurtenance of it[3] *causes*

the accident within the meaning of the Admiralty Extension Act. Since the injury to Stephens in the instant case did not occur on the ship, the applicability of maritime law depends upon whether his injury was "caused" by the ship or its appurtenances.

Maritime law may conceivably be invoked upon either one of two theories: (a) the action of the ship's winch on the coil "caused" the injury, or (b) the defectively packaged coil had become ship's cargo so that its springing open was imputable to the ship, and in that sense the ship "caused" the injury.

What is the meaning of the word "caused" appearing in the Admiralty Extension Act? If "but for" causation is enough,[4] the action of the ship's winch in lifting neighboring coils to allow the coil that injured Stephens to spring open would invoke maritime law. If, on the other hand, the word means "proximate cause" the involvement of the winch does not support application of maritime law, for the only permissible inference from the facts is that the proximate cause of the injury, assuming it was not simply an accident, was some defect in the banding of the springing coil not attributable to the ship; nothing indicated improper handling of the winch.

The Fifth Circuit has, we think, adopted a "proximate cause" construction in two cases. In *Kent v. Shell Oil Co.,* 286 F.2d 746 (5th Cir. 1961), the court held that maritime law did not apply when a truck driver was injured by oil field pipe that unexpectedly rolled off his truck bed onto him as he stood between his truck and the barge onto which the pipe was to be loaded. At the time of his injury the driver was trying to realign two displaced timber skids, along which

---

**3.** The text of the Admiralty Extension Act refers only to injuries caused by "a vessel." *See* text, *supra,* at p. 978. The Supreme Court has interpreted the Act as extending the ship's liability for its crew and its "appurtenances" as well. *Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 209–10, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *see Victory Carriers, Inc.*

*v. Law,* 404 U.S. 202, 210–11, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971).

**4.** Professors Harper and James use the phrase "cause in fact" to denote limitless causation—noting Eve's trespass caused all our woe. 2 F. Harper & F. James, The Law of Torts 1108 (1956).

the pipes were to be rolled from truck to barge. The court stated:

> There was . . . absolutely no evidence whatsoever that anything done on the barge or in the handling of the skids caused the pipes to move or roll on [the driver]. In a physical sense, this was due to the manner in which the pipe was loaded or left on the truckbed, was handled by the helper at the other end, or was not properly secured.

> . . . . .

> It might be argued that he would not have been in that position were it not for the skids being used. But the cause of the injury in no sense could be attributed to the vessel or its appurtenances, even if it is assumed that the skids were part of the barge's equipment . . . . . This means that the "injuries" were non-maritime in nature. The extension of admiralty jurisdiction statute, 46 U.S.C.A. § 740, does not therefore make a classic non-maritime, land-based injury into something else.

286 F.2d at 749–50. And in *Adams v. Harris County,* 452 F.2d 994 (5th Cir.), *cert. denied,* 406 U.S. 968, 92 S.Ct. 2414, 32 L.Ed.2d 667 (1972), the Fifth Circuit reversed a district court's finding that admiralty law extended to an injury suffered by a motorcyclist who ran into a draw-bridge barricade suddenly lowered when the draw-bridge operator thought that an approaching pleasure craft had signaled to pass through. The district court had applied admiralty law because "there was a chain of events which began with the ship's approach to the bridge and subsequently moved landward to bring about plaintiff's injuries." 316 F.Supp. 938, 943 (S.D.Tex.1970). The court of appeals disagreed:

> Did the vessel cause the injuries to the motorcyclist on the bridge? The vessel was simply approaching the bridge, as any vessel in those waters had a right to do. There is no showing that it was negligent in any respect. It is not charged with a tort of any kind. It

had no control, could exercise none, and attempted to exercise none over the manner in which the bridge keeper performed his duties. . . . [T]he bridge keeper caused the bridge to begin to open, which, in turn, caused the barricade to drop, without any indication from the vessel that it was necessary to do so. The inescapable conclusion is that the dropping of the barricade was solely the act of the bridge keeper and no act of the vessel proximately caused his negligence, if there was any.

> It inexorably follows that the injuries complained of were in no way caused by a vessel on navigable water. Jurisdiction is not saved by the Admiralty Extension Act.

452 F.2d at 996–97.

█ We agreed with the Fifth Circuit, and so hold, that a ship or its appurtenances must proximately cause an injury on shore to invoke the Admiralty Extension Act and the application of maritime law. Both the congressional purpose behind the Act and considerations of federalism emphasized by the Supreme Court support this interpretation. Congress passed the Act "specifically to overrule or circumvent" a line of Supreme Court cases holding that maritime law did not extend to torts culminating in injury on land even when a ship on navigable waters was clearly the proximate cause. *See Victory Carriers, supra,* at 209 & n. 8, 92 S.Ct. 418. There is no indication in the legislative history that Congress intended to go further and extend maritime law to land-based torts where a ship is not at fault, but supplies only a fortuitous but-for connection with an injury. *Cf. Di Paola v. International Terminal Operating Co.,* 294 F.Supp. 736, 740 (S.D.N.Y.1968), *remanded on other grounds,* 418 F.2d 906 (2d Cir. 1969). The Supreme Court in *Gutierrez* neither suggested such a congressional intention nor indicated that such an extension would have been constitutionally permissible. The Court held only that maritime law applied when

it is alleged that the shipowner *commits a tort* while or before the ship is being unloaded, . . . the impact of which is felt ashore at a time and place not remote from the *wrongful act.*

373 U.S. at 210, 83 S.Ct. at 1188 (emphasis added); *cf. Nacirema Operating Co. v. Johnson,* 396 U.S. 212, 221–23, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969).

█ Interpretation of the Act as requiring proximate cause also better accommodates federal and state interests than would but-for causation. In *Victory Carriers* the Supreme Court explained its reluctance to extend admiralty law farther than was supported by the Act:

We are dealing here with the intersection of federal and state law. As the law now stands, state law has traditionally governed accidents like this one. To afford respondent a maritime cause of action would thus intrude on an area that has heretofore been reserved for state law, would raise difficult questions concerning the extent to which state law would be displaced or pre-empted, and would furnish opportunity for circumventing state workmen's compensation statutes. In these circumstances, we should proceed with caution in construing constitutional and statutory provisions dealing with the jurisdiction of the federal courts.

404 U.S. at 211–12, 92 S.Ct. at 425. Although the Supreme Court was considering whether to go beyond the Act, while

we are attempting to construe the Act itself, we believe the Court's admonition to "proceed with caution" applies equally in this case. A "cause-in-fact" construction of the Act would open the way to displacement of state negligence law by federal admiralty law in many more situations than does the "proximate cause" construction,[5] and this would in turn open the district courts to many more claims by virtue of the federal admiralty jurisdiction, 28 U.S.C. § 1333.[6] As the Supreme Court noted, federal courts should "proceed with caution" in matters affecting their own jurisdiction as well as the reach of federal substantive law. *Cf. Healy v. Ratta,* 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1934). A "proximate cause" interpretation is an exercise of such caution.[7]

█ This leaves only the question of whether the coil said to have sprung open had become ship's cargo so that the ship was responsible for any defect in its banding. It is clear that an unseaworthiness claim exists against a ship under federal maritime law for improper stowage or defective packaging of cargo. *See Gutierrez, supra,* at 212–14, 83 S.Ct. 1185; *Garrett v. Gutzeit,* 491 F.2d 228, 232 (4th Cir. 1974). But when do goods become "cargo"?

█ We agree with the cases applying maritime law to injuries caused by defective stowing or packaging of goods in place on the ship's deck, *e. g., Rich v. Ellerman and Bucknall S. S. Co.,*

5. *See generally* 2 F. Harper & F. James, The Law of Torts, 1108–1110 (1956).

6. A cause-in-fact interpretation would also, in circumstances like those here, make the applicability of federal maritime law turn on such a fortuity as whether the coils neighboring the allegedly defectively-banded one happened to be lifted by a ship's winch instead of a pier-based crane.

7. For an example of the kind of involvement of a ship's equipment that would support application of maritime law under the Admiralty Extension Act, *see Tucker v. Calmar Steamship Corp.,* 457 F.2d 440 (4th Cir. 1972), where this circuit in an opinion by the late Judge Sobeloff held that an unsafe method of loading had rendered a ship unseaworthy. As Judge Sobeloff stated, 457 F.2d at 442 n. 1, "the proxi-

mate cause of [the] injuries was the unreasonable use of the ship's gear in loading operations, bringing the case within the rule of *Gutierrez* and the purview of section 740." *Compare also Thompson v. Calmar Steamship Corp.,* 331 F.2d 657 (3d Cir.), *cert. denied,* 379 U.S. 913, 85 S.Ct. 259, 13 L.Ed.2d 184 (1964) (unseaworthiness due to unsafe method of loading found where ship's winch and engines used to "bump" railroad cars into position for unloading with result that plaintiff was knocked from a car and run over); *Kloster v. S. S. Chatham,* 475 F.2d 43 (4th Cir. 1973) (allegation that ship's crew was negligent in allowing mooring lines to become slack during gondola-to-ship loading was sufficient to bring suit in admiralty). *See generally Snydor v. Villain & Fassio,* 459 F.2d 365 (4th Cir. 1972).

278 F.2d 704, 707 (2d Cir. 1960); *Reddick v. McAllister Lighterage Line, Inc.,* 258 F.2d 297, 299 (2d Cir.), *cert. denied sub nom. McAllister Lighterage Line, Inc. v. John T. Clark & Son, Inc.,* 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229 (1958). Such cases simply apply the rule of unseaworthiness in its time-honored place, seaward of the gangplank.[8] Fault is not an essential element of the doctrine of "unseaworthiness"[9] but conceptually and theoretically it may rest upon an irrebuttable presumption of opportunity to prevent harm. Once goods are put aboard, the condition of containers and packaging are within the control of the master of the vessel, and in most instances, although not all, defective packaging is discernible by inspection. If most defects are ascertainable it is a rough sort of justice and not intolerable to assume that all are. Thus it is possible to say that the no-fault concept of unseaworthiness rests in part, at least theoretically, upon the ship's "fault" in failing to discern and correct conditions that may cause injury. Another reason, and perhaps a better one, for imputing responsibility for defective cargo to the ship is that once the ship is at sea the stress and strain of a voyage may break the packages, and it would thereafter be all but impossible to allocate responsibility as between the packager ashore and the ship's officers who subsequently undertake to move the cargo in a dangerous condition.

These factors do not come into focus when we concentrate upon goods in a railroad car on a pier—as yet untouched by the ship's gear. Not even theoretically may it be said there has been any opportunity to inspect; certainly not, as to a coil of wire held down by other heavy coils piled on it. When beans being unloaded from a ship spill on a dock, as in *Gutierrez,* who can say whether the spillage was caused by defective original packaging, movement at sea caused by the elements, or improper handling by the ship's crew? In such a situation the law throws up its hands and imputes liability to the last person in command of the situation. But if the beans are moving from the dock to the ship, as the coil of wire in this case, it is not possible even to surmise that defective packaging might have been caused by the ship's personnel.[10]

**8.** Once goods are in place on a ship the Admiralty Extension Act would usually not be needed to support the application of admiralty law, since in the normal case any injury from the goods would occur on the ship and on navigable water, and thus be within the traditional maritime jurisdiction. The Act would come into play, however, if such goods did not cause injury while in place, but only later during their unloading and on the pier. *See, e. g, Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Garrett v. Gutzeit,* 491 F.2d 228 (4th Cir. 1974). The only limitation in such a case would be that the injury occur "at a time and place not remote from the wrongful act." *Gutierrez, supra,* at 210, 83 S.Ct. at 1188; *see Garrett, supra,* at 232–33.

**9.** The first authoritative statement which recognized the right to recover damages for injuries caused by unseaworthiness was made in *The Osceola,* 7 Fed.Cas. 755, No. 3,930 (D.Pa.1789).

G. Gilmore & C. Black, The Law of Admiralty 316 (1957). It was said in that case that both ship and shipowner are "liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship." The use of the word "failure" in the last clause connotes an idea of fault, but it is now clear, as the doctrine of unseaworthiness has developed, that it is a no-fault concept. *See generally Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 213, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); G. Gilmore & C. Black, *supra,* at 315–32. *But cf. Usner v. Luckenbach Overseas Corp.,* 400 U. S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971) (no claim for unseaworthiness for injury caused by negligence of longshoreman who happened to be standing on ship's deck).

**10.** In *Gutierrez,* Mr. Justice Harlan said in dissent:

Presumably the result reached by the Court would be the same—at least consistency demands that it should be the same—if this accident had occurred on the dock while the beans were being *loaded* rather than unloaded.

373 U.S. at 220, 83 S.Ct. at 1194 (emphasis in original). We think that he clearly meant that the Court's decision turned on the direction of the load—coming off the ship rather than being onloaded.

We are brought back again to the language of the Admiralty Extension Act that extends maritime law to injuries "caused by a vessel on navigable water." We assume the Congress, under Art. III, § 2 could have extended maritime law shoreward by an enactment that the unseaworthiness doctrine should apply to all goods collected on a pier within a given distance from a ship for the purpose of being loaded aboard. *See* n. 2 *supra.* Instead, the Congress chose the language "caused by a vessel." In so doing it embraced a fault idea that is applicable initially to invoke even a no-fault concept. Because it is not conceptually possible to charge the ship with having caused the defective packaging we think the no-fault doctrine of unseaworthiness is inapplicable on the facts of this case. For a ship to be responsible for injuries shoreward of the gangplank we think it must proximately cause injury to those ashore.

To hold otherwise is to embark upon endless line drawing until we get to a time and place "remote from the wrongful act." *See Gutierrez, supra,* at 210, 83 S.Ct. 1185. But there has not even been a *wrongful* act. The ship's only act was

using its winch in a proper manner without any opportunity to inspect and foresee that injury might occur if the top coil were lifted.

To go at the problem in terms of linear measurement from the ship, without respect to fault, invites caprice. Which factor is decisive: (1) physical contact with the railroad car, (2) piece-by-piece contact with packages in the car, (3) engagement of the ship's winch, (4) the beginning of the hoist or (5) somewhere in between, over the gangplank? Or do we go further from the ship: the next railroad car, perhaps, or all goods on the particular pier, or in the shipyard?

▪▪▪ For all of the foregoing reasons we hold that the no-fault doctrine of unseaworthiness with respect to packaging becomes operable seaward of the gangplank, *i. e.,* when goods first come to rest on shipboard,[11] and thereafter continues to operate shoreward, in the offloading process, to a point not remote in time and place.[12]

To hold otherwise cannot be squared with the idea of causation expressed in the Admiralty Extension Act.[13] It would be absurd to exonerate the ship for its

11. In *United States Lines Co. v. King,* 363 F.2d 658 (4th Cir. 1966), this circuit upheld a jury verdict of unseaworthiness based, apparently, on a finding that defective metal bands used to bundle flitches were the proximate cause of a longshoreman's injury that occurred when some of the flitches fell from a forklift onto him during the process of loading the flitches onto a ship. Since it is clear from the opinion that the injury occurred on board the ship, maritime law was applicable under the traditional locality theory without any need for the Admiralty Extension Act. Thus the question was simply whether the defective bands could amount to defective cargo containers so as to render the ship unseaworthy. The court appears to have answered in the affirmative. 363 F.2d at 661. In part, however, *King* also rested on a theory that the bands were used as loading tackle, and therefore on Supreme Court cases that suggest a ship is responsible for the seaworthiness of any equipment on board. *Alaska S. S. Co. v. Petterson,* 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954); *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *see* G. Gilmore & C. Black, The Law of Admiralty 324–28 (1957).

Our holding is consistent with *King,* since the flitches had once come to rest aboard ship before the injury. 363 F.2d at 660.

12. Plaintiff urges that the district court erred in refusing to allow opinion testimony by an experienced longshoreman to the effect that improper banding probably caused the wire coil to spring open and knock Stephens off the gondola car. Since the court based its finding of no unseaworthiness partly on the absence of any evidence that the coils were improperly banded, this testimony was obviously very important. We need not decide whether exclusion of the testimony was reversible error because we have held that proof of defective banding would not support application of maritime law.

13. Subjecting this ship to unseaworthiness liability, thus leaving the door ajar to even further extensions of maritime law and federal court jurisdiction, would also disregard the Supreme Court's admonition that we "proceed with caution" in this area. *See* text at page 980, *supra.*

active conduct in operating its winch and then impute to it responsibility for defectively packaged goods it has not yet touched.

*Affirmed.*