In the Matter of the Petition of ASH-LAND OIL, INC., as Charterer of the BARGE STC–2518B for Exoneration from or Limitation of Liability, Petitioner,

v.

THIRD NATIONAL BANK OF ASHLAND, KENTUCKY, Executor of the Estate of George Douglas Richardson, Deceased; Rich Terminal Company; Tanner Oil Company, et al., Claimants.

Civ. A. No. 79–105.

United States District Court, E.D. Kentucky, Covington Division.

Jan. 19, 1983.

Stanley M. Chesley and William R. Ellis, Waite, Schneider, Bayless & Chesley, Cincinnati, Ohio, for petitioner Ashland Oil, Inc.

Raymond G. Hasley, Pittsburgh, Pa., and Harold E. Kelly, Ashland, Ky., for claimant Third Nat. Bank of Ashland, Ky. (Executor of Richardson).

Michael Eagen and Gordon Greene, Cincinnati, Ohio, for claimant Rich Terminal Co. and intervening defendant Hartford Acc. and Indemnity Co.

Ted Earl, Columbus, Ohio, for claimant Tanner Oil Co.

Rodney Bryson, Covington, Ky., for claimants Travelers Ins. Co., The Cincinnati Ins., U.S. Fidelity & Guaranty Ins. Co.

Jack T. Baker and Max Picklesimer, Ashland, Ky., for claimants Glenn Lewis and Miriam Lewis, his wife.

C.J. Demichelis and John K. Hurd, McCaslin, Imbus & McCaslin, Cincinnati, Ohio, for claimant Nat. Union Fire Ins. Co.

Edward Goldman, Cincinnati, Ohio, for intervening plaintiff U.S. Fire Ins. Co.

Thomas Mester, Komito, Nurenberg, Plevin, Jacobson, Heller & McCarthy Co., Cleveland, Ohio, for claimant Marlene Pack, Administratrix of the Estate of William L. Pack, deceased.

MEMORANDUM OPINION

BERTELSMAN, District Judge.

This case arises out of the disastrous explosion and fire of March 22, 1979, in a gasoline storage facility owned by the Rich Terminal Company at Ironton, Ohio, on the banks of the Ohio River. Rich Terminal, Inc., an Ohio corporation, with its principal place of business in Ohio, owned the gasoline storage facility (tank farm) on which the explosion occurred. Tanner Oil Company (hereinafter Tanner), an Ohio corporation, with its principal place of business in Ironton, Ohio, managed and operated the tank farm. Ashland Oil, Inc. (hereinafter Ashland), a Kentucky corporation, with its principal place of business in Russell, Kentucky, delivered gasoline, via river barge, to the tank farm at the direction of Tanner.

In the wake of this unfortunate occurrence, Ashland commenced an action before this court for exoneration or limitation of liability. It is in this form that this court exercised jurisdiction to hear the multiplicity of claims involved in the controversy. Glenn and Meriam Lewis, Marlene Pack, as administratrix of the estate of William Pack, Third National Bank of Ashland, as executor of the Estate of Douglas Richardson, Sherry and Carson Elswick, Rich Terminal Co., Rich Distributors, Inc. and Tanner all filed claims against the petitioner. The same parties also filed cross-claims among themselves alleging liability for the explosion and resulting injuries.

Following lengthy pretrial proceedings, the case was tried to the court without a jury. The evidence at trial revealed the explosion occurred as a direct and proximate result of negligent procedures utilized in the loading and off-loading of premium gasoline from the river barge STC–2518. The trial resulted in a finding of liability in the following percentages: Ashland Oil, Inc., 30 percent; Tanner Oil Company, 70 percent. This opinion discusses various novel legal issues that arose in the course of the litigation.

I. FACTS

It would do well at the beginning of this opinion to depict in some detail the setting of the disaster. Many of the photographs of the aftermath are aerial views. One is appended so that the reader may better visualize the scene. If one had been able to view the scene shortly before the explosion from the same distant perspective, he would see the blocks of buildings intersticed by streets. Alongside the river, bounded by an earthen levee on one side and railroad tracks on the other, standing in a row and set between the square outlines of buildings, he would see three cylinders of graduated sizes. These are gasoline storage tanks which became the focal point of this drama. The smallest holds nearly 8,000 barrels of fuel. (One barrel equals 42 gallons). In the river, parallel to the tanks, the levee and the railroad tracks, is the unwieldly form of the barge, which plays no small part in the story. Suddenly, it may be seen that one of the huge tanks is overflowing. Shortly, a firetruck appears and more figures gather. A tanker truck pulls up beside a loading dock adjacent to the overflowing tank.

Minutes go by and then a flash of fire and an explosion occur. The overflowing tank and the tanker truck explode. A ball of fire blows out the truck's front end, flattening the cab. The fire in the cylinder builds of the smoke a colossal chimney that towers commandingly over the scene.

The evidence at trial disclosed the events leading up to this catastrophe. On March 22, 1978, Tanner, through its employee Bob Runyon, placed an order for 4,000 barrels "max" of premium gasoline with Ashland. Ashland, as was its usual practice, began pumping gasoline from its own storage tanks in Kenova, West Virginia, into barge STC–2518. Normally, upon completion of the loading of the STC–2518, Ashland would tow the barge on the Ohio River to the tank farm at Ironton, whereupon Ashland would pump the gasoline from its barge into shore-based tanks.

As shown in the appended photograph,* the tank farm consisted of three storage tanks with capacities of 8,000, 12,000 and 25,000 barrels respectively. The tanks were located about 100 yards from the Ohio River. Upon delivery, the gasoline was carried from the barge to the tanks through hoses and fixed pipes. Power for the pumping operation was supplied by pumps located on the barges. The gasoline was drawn from the tanks by tanker trucks, which delivered it to various gas stations. To load, the gasoline trucks pulled up to a loading dock adjacent to the 8,000 barrel capacity premium storage tank on the side opposite the river.

The evidence revealed that, on the date in question, the Ashland barge actually contained approximately 4,303 barrels of premium gasoline, as opposed to the 4,000 barrels actually ordered. A manifest that listed the cargo aboard the barge indicated that the barge contained only 4,014 barrels of premium gasoline. The reason for the discrepancy was that a "line fill" of gasoline totalling 289 barrels had been placed on the barge before the actual order of 4,000 barrels began to be pumped. A "line fill" is that quantity of gasoline contained in the lines between the shore-based tanks at the loading facility and the barge. The amount in the line, approximately 289 barrels, was placed onboard the barge without being accounted for on the barge manifest, which was supposed to accurately tally the total number of barrels on board.

Although the barge manifest did not indicate the correct number, a pump-house report, a barge-metering report, and three meter tickets revealed that the true amount was 4,303 barrels. These figures were available to one Ben Burke, the terminal manager and superintendent of Ashland at Kenova, but not to those at the receiving end of the barge. Burke had supervisory authority over the entire Ashland-Kenova facility, including over the employees who actually loaded and unloaded the STC 2518B.

After the completion of the loading at Ashland's Kenova facility, the barge was transported by Ashland, via towboat, approximately 10 miles downstream to the tank farm at Ironton for unloading. Ashland sent an employee, Tankerman James White, to perform the unloading operations. Tankerman White, however, did not ride the barge to his destination but instead traveled there by truck. Upon his arrival at the tank farm, White was met by Ronald Reed, a Tanner employee, who was to cooperate in unloading the gasoline from the Ashland barge into the 8,000 barrel-capacity premium storage tank.

The evidence subsequently demonstrated that Ashland's employee, White, was not aware that the barge actually contained 4,303 barrels. In fact, White advised Reed and a Coast Guard inspector that there were only 4,014 barrels of gasoline aboard.

After pumping operations commenced, White turned the unloading over to Reed, though he remained on the barge attending to his other duties. Reed, however, failed to monitor the flow of gasoline into the storage tanks. He abandoned his post and paid little attention to the actual pumping operations. As a result of the barge overload, the inaccurate manifest, the failure of Reed to monitor the gasoline flow, and the failure of either Ashland or Tanner employees to use strapping tables to ascertain correct capacities of the barge or land-based tanks, an overflow of several thousand gallons of gasoline occurred.

After they discovered the spill, Reed and Runyon went to the site of the spill to determine its extent, but did little to correct it. Meanwhile, Douglas Richardson, the President of Rich Distributors, Inc., and two Rich Distributor employees, Glenn Lewis and William Pack, had also learned of the spill. In the face of the imminent danger and sudden emergency it presented, Richardson directed Pack to bring in a tanker truck in order to siphon enough gasoline from the premium storage tank to staunch the flow. To accomplish this, a tanker truck was positioned at the loading

* Huntington Publishing Co. photograph reproduced by permission.

rack. Unfortunately, however, the gasoline ignited. In the ensuing explosion of the truck and the storage tank, Richardson and Pack were killed, Lewis was injured and property was extensively damaged.

It was the contention of petitioner Ashland that the actual source of ignition was static electricity inside the truck caused by the splash loading of gasoline from the premium storage tank. The more reliable evidence, however, pointed to another source. Moreover, the testimony of Lewis indicated that the gas ignited outside the truck seconds before the truck actually exploded. It was the conclusion of the court that the most probable source of ignition was the relay switch near the loading rack.

## II. ANALYSIS

Four significant issues emerged in the course of this litigation. First, a number of the parties objected to the court's exercise of admiralty jurisdiction. Second, Tanner questioned the court's exercise of jurisdiction over cross-claims brought against it. Third, some of the parties demanded that the case be tried to a jury. Finally, Ashland asserted that, even if it were liable, it was entitled to limitation of liability because any negligence of its employees was without the company's privity or knowledge.

### A. Admiralty Jurisdiction

■ The jurisdictional issue was of paramount importance in this case. First of all, admiralty was the sole basis for the jurisdiction of this court, since complete diversity did not exist among the parties. It was, therefore, incumbent upon the court to scrutinize the factual basis for maritime jurisdiction, since its taking jurisdiction of this litigation stayed the parties from pro-

ceeding in state court, as it would otherwise have been their right to do. F.R.Civ.P. Supp. Rule F. Also, the existence of maritime jurisdiction determined the substantive law applied to many of the issues in this case.[1] Not only does the court have an obligation to construe strictly the basis of its jurisdiction, however, it also has a correlative duty to exercise jurisdiction, if it is proper.

■ Several of the parties objected to the court's assertion of admiralty jurisdiction. Both those who made claims for damages and those who were accused of negligence along with Ashland objected. Those asserting claims preferred the state forum, with its concomitant right to trial by jury. Tanner concurred in that choice. Of course, all of these parties also wished to thwart Ashland's attempt to limit its liability to the value of the barge. In spite of these objections, the court held that admiralty jurisdiction did exist.

Those objecting to this court's exercise of admiralty jurisdiction argued that, although the gasoline which overflowed from the storage tank was being pumped from a barge which rested on navigable waters, nevertheless, the unloading was a joint operation. The overflow, fire, explosion, personal injuries and property damage all occurred some 300 feet from the river's edge, and the persons injured were not engaged in maritime occupations, but were the employees of a land-based gasoline distributing company. The persons injured, it was forcefully argued, were not directly involved in the maritime activity asserted as the basis for jurisdiction, that is, the unloading of the barge. It was also asserted that, although a vessel was obviously a causal factor in fact of the overflow, any negligence was committed by land-based employees of Ashland, since the vessel had no crew or personnel regularly assigned to it.

---

1. G. Gilmore and C. Black, *The Law of Admiralty* § 1–16 (2d ed. 1975) [hereinafter Gilmore & Black].

Originally, federal maritime jurisdiction was confined to those incidents which took place on the navigable waters.[2] Under the Extension of Admiralty Jurisdiction Act, 46 U.S.C. § 740 (1976), passed in 1946, however, the admiralty jurisdiction of the United States District Courts was expanded:

> "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."

The definitive interpretation of this statute was given by the Supreme Court of the United States in *Gutierrez v. Waterman Steamship Corp.*[3] There, a longshoreman had suffered personal injuries when he slipped on some loose beans spilled on the dock from broken and defective bags being unloaded from a ship. The longshoreman filed a libel in admiralty against the ship, claiming damages for injuries caused by the ship's alleged unseaworthiness and by the negligence of its owner. In response to the defendant's argument that it was not liable in admiralty, the Court enunciated the following test for the exercise of maritime jurisdiction over injuries occurring on land:

> "We think it sufficient for the needs of this occasion to hold that the case is within the maritime jurisdiction under 46 U.S.C. § 740 when, as here, it is alleged that the shipowner commits a tort while or before the ship is being unloaded, and

the impact of which is felt ashore at a time and place not remote from the wrongful act."[4]

The *Gutierrez* test was further refined in *Victory Carriers, Inc. v. Law,*[5] in which the Court held that it was improper to assert admiralty and maritime jurisdiction over a personal injury action by a longshoreman who had been injured while operating a forklift on a pier. The court found the typical elements of a maritime cause of action to be too attenuated, since the forklift was not under the control of the ship or its crew, and the accident did not occur aboard ship or on the gangplank. The court recognized that a test based on whether the tort occurred while the ship was unloading and caused an impact felt ashore was too broad:

> "Reliance upon the gangplank line as the presumptive boundary of admiralty jurisdiction, except for cases in which a ship's appurtenance causes damage ashore, recognizes the traditional limitations of admiralty jurisdiction, ... and decreases the arbitrariness and uncertainties surrounding amorphous definitions of 'loading.' Such uncertainties may prejudice both the longshoreman and the employer."[6]

The bounds of admiralty jurisdiction over claims originating during loading and unloading of vessels were further delineated in *Garrett v. Gutzeit O/Y,*[7] in which the court held that "[c]argo containers coming

---

**2.** This traditional test of admiralty jurisdiction is called the locality rule. The scope of the general admiralty jurisdiction of the federal courts, conferred by Congress in 28 U.S.C. § 1333 (1976), has recently been reevaluated by the Supreme Court. In *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), which concerned a plane crash on Lake Erie, the Supreme Court amended the rule to require that a wrong cognizable in admiralty occur not only on the navigable waters, but also that the wrong bear a significant relation to traditional maritime activity. In *Foremost Insurance Co. v. Richardson,* —— U.S. ——, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Supreme Court limited *Executive Jet* to its facts and held that there was no requirement that this traditional activi-

ty be commercial. If the wrong "involve[d] the negligent operation of a vessel on navigable waters ... that [would be] a sufficient nexus to traditional maritime activity to sustain admiralty jurisdiction in the District Court." *Id.* at ——, 102 S.Ct. at 2658.

**3.** 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963).

**4.** *Id.* at 210, 83 S.Ct. at 1188 (note omitted).

**5.** 404 U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971).

**6.** *Id.* at 214 n. 14, 92 S.Ct. at 426 n. 14.

**7.** 491 F.2d 228 (4th Cir.1974).

from a vessel's hold satisfy the appurtenance requirement of *Victory Carriers.*"[8]

This court finds highly persuasive on the issue of admiralty jurisdiction the excellent opinion by Judge Wellford in *Complaint of Cook Transportation System, Inc.*[9] That case was also a limitation of liability action, brought by the charterer of a barge. The petitioner sought to limit its liability for injuries caused by an explosion and fire occurring in a conveyor system carrying unloaded soybeans from a barge to a silo. Maritime jurisdiction was attacked there on much the same basis and for much the same reasons as here. Judge Wellford held that jurisdiction existed, pointing out that the explosion allegedly resulted from negligent maritime activity that had occurred in the process of unloading and weighing the cargo at a point adjacent to the dock, not too remote from the navigable waters of the Mississippi River:

> "A reasonable construction of claimant's assertions in their various suits relate directly to activities on the barge; allowing grain with foreign objects to be loaded upon it, allowing grain to be shipped in an unclean and unfit barge; failure to advise the designee of shipment as to the defective or dangerous nature of cargo, and negligent shipment and barge condition, generally. Under the rationale, then, of *Gutierrez v. Waterman, supra,* and progeny, admiralty and maritime jurisdiction applies to this 'ship to shore' type of tort regardless of the fact that injury occurred on land. Loading and unloading of cargo are traditionally considered as 'work of the sea.' *Seas Shipping Co. v. Sieracki,* 328 U.S. 85,

66 S.Ct. 872, 90 L.Ed. 1099 (1946); *Brisco v. American President Lines,* 325 F.Supp. 1259, 1261 (N.D.Cal., 1970)."[10]

Application of these authorities to the facts of the present case yields the conclusion that admiralty jurisdiction exists in this matter. The accident resulted from the traditional maritime activity of loading and unloading a barge engaged in commerce upon the navigable waters of the United States, namely the Ohio River. It was the cargo of the barge, the gasoline, that overflowed upon the ground, or displaced the gasoline that did overflow. The force causing the overflow was the pump located on the barge, operated by an employee of the vessel owner. The negligence of Ashland occurred in the process of loading the barge and the filling out of the manifest that accompanied it. The disastrous explosion was not remote in time from the accident-causing forces generated on the barge. Although the overflow and fire occurred at a greater distance from the water's edge than in the cases just discussed, the forces originating on the barge were directly and continuously applied to the tank and its contents. Because the precipitating forces produced the overflow in an unbroken continuum, the cause was not remote from the result in a legal sense. All of the criteria set forth in the authorities above cited exist here, and therefore, so does admiralty jurisdiction.

### B. Jurisdiction over Cross-claims against Tanner

Upon having their various state court actions against Ashland stayed, the claim-

---

**8.** *Id.* at 232. *Cf. Pryor v. American President Lines,* 520 F.2d 974 (4th Cir.1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976) (the Admiralty Extension Act and maritime law apply when a ship or its appurtenances proximately cause an injury on shore). *See also Sacilotto v. National Shipping Corporation,* 520 F.2d 983 (4th Cir.1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976) (a ship or its appurtenances did not proximately cause an injury on shore, when an untouched coil of wire sprang open during the lifting of other coils from a railroad car on a pier onto a ship).

**9.** 431 F.Supp. 437 (W.D.Tenn.1976); *see also Parsel v. City Lumber Co.,* 1977 A.M.C. 1704 (D.C.Conn.1976) (when discharging operations of a vessel on navigable waters combine with improper management of shoreside aspects of the discharging to injure an adjoining landowner, jurisdiction under the Admiralty Extension Act applies to both the vessel and shoreside terminal operators).

**10.** 431 F.Supp. at 442.

ants filed their claims herein as required by Supplemental Rule F(5) of the Federal Rules of Civil Procedure governing admiralty claims. The claimants, in addition to contesting Ashland's right to exoneration or limitation of liability, filed cross-claims against Tanner Oil, which they alleged was a joint tortfeasor with Ashland, and was partially responsible for the disaster in failing properly to monitor the premium storage tank as it was being filled with gasoline.

Tanner objected to the court's entertaining these cross-claims, arguing that it was not a maritime defendant, and that it had a right to have the claims against it determined in state court. Tanner's arguments appeared to have some logic behind them. For, as it contended, Tanner was indeed not engaged in any activities on the water. Its employees who were charged with negligence were not seamen. Rather, their primary duties involved managing a tank farm located approximately 100 yards from the water's edge. Tanner acknowledged the court's jurisdiction to determine the extent of Ashland's liability, but vigorously contested its power to award any affirmative judgment against Tanner. Any such jurisdiction, Tanner asserted, would have to be founded upon the court's diversity jurisdiction, which was lacking.

Nevertheless, the court concluded that it had jurisdiction to entertain the cross-claims against Tanner and to award a judgment against it were it found liable, as it ultimately was. First of all, Supplemental Rule A makes the other Federal Rules of Civil Procedure applicable to admiralty and maritime proceedings. One of those rules is, of course, Rule 13(g), which expressly provides that a "pleading may state as a cross-claim any claim by one party against a co-party arising out of a transaction or occurrence that is the subject matter ... of

the original action." Clearly, the cross-claims asserted by the claimants herein against Tanner meet these criteria. Further, the jurisdiction of this court to countenance such cross-claims is fully supported by authoritative precedents, and is in accord with the principles and policies of admiralty law.

More than 50 years ago, in *Hartford Accident & Indemnity Co. v. Southern Pacific Co.*,[11] Chief Justice Taft pointed out that a limitation proceeding is to be given wide scope, that the proceeding is equitable in nature and that it is similar to a bill in equity to enjoin a multiplicity of suits.[12] The Chief Justice emphasized that the statute was to be given "a very broad and equitable construction for the purpose of ... facilitating a settlement of the whole controversy ... and that all the ease with which rights can be adjusted in equity is intended to be given to the proceeding."[13] Stating that the limitation proceeding was "the administration of equity in an admiralty court,"[14] the Chief Justice further described its potent thrust:

> "The proceeding partakes in a way of the features of a bill to enjoin a multiplicity of suits, a bill in the nature of an interpleader, and a creditor's bill. It looks to a complete and just disposition of a many cornered controversy, and is applicable to proceedings *in rem* against the ship as well as to proceedings *in personam* against the owner, the limitation extending to the owner's property as well as to his person."[15]

Emphasizing that it was essential to the proper functioning of the limitation proceeding that it be able to provide a complete remedy to all parties, petitioner and claimants alike, the Chief Justice continued:

> "Where a court of equity has obtained jurisdiction over some portion of a controversy, it may and will in general proceed

---

**11.** 273 U.S. 207, 47 S.Ct. 357, 71 L.Ed. 612 (1927).

**12.** *Id.* at 215, 47 S.Ct. at 359.

**13.** *Id.* at 215–216, 47 S.Ct. at 359.

**14.** *Id.* at 216, 47 S.Ct. at 359. *See Guillot v. Cenac Towing Co.*, 366 F.2d 898, 904 (5th Cir. 1966) ("In the Admiralty the Chancellor now goes to sea and has adequate equitable reserves.").

**15.** 273 U.S. at 216, 47 S.Ct. at 359.

to decide all the issues and award complete relief, even where the rights of parties are strictly legal and the final remedy granted is of the kind which might be conferred by a court of law ... Of course, this equitable rule enlarging the Chancellor's jurisdiction, in order to completely dispose of the cause before him, does not usually apply in an admiralty suit .... But this limitation of liability proceeding differs from the ordinary admiralty suit, in that, by reason of the statute and rules, the court of admiralty has power ... to do what is exceptional in a court of admiralty—to grant an injunction, and by such injunction bring litigants, who do not have claims which are strictly admiralty claims, into the admiralty court .... There necessarily inheres, therefore, in the character of the limitation of liability proceeding, in reference to such non-admiralty claims, the jurisdiction to fulfill the obligation to do equitable justice to such claimants by furnishing them a complete remedy." [16]

 It is true that, even in administering a limitation proceeding, the federal court must respect the rights of the parties to invoke the jurisdiction of the state courts, when the policies sought to be effected by the limitation proceeding will not be thwarted thereby.[17] Here, however, the policies of the limitation of liability statute would be frustrated were the plaintiffs remanded against their will to the state courts once the issues relating to Ashland's right *vel non* to exoneration or limitation of liability are tried. Part of Ashland's defense is that Tanner, rather than it, was solely negligent, and, in the alternative, that Tanner's negligence was the sole cause or a superseding cause of the disaster. Were plaintiffs' cross-claims consigned to state court, they would be required to try their case twice and thus be subjected to great inconvenience and expense.

Because of the latter considerations, the court finds that *British Transport Commission v. United States*,[18] is in point and controls the issue under discussion.[19] There, the United States, owner of one vessel involved in a collision on the high seas, sought a limitation of its liability to the other ship's owner. The other shipowner, in turn, asserted a claim against the United States. Several of the ship's passengers who had been injured in the collision also filed claims against it in the limitation proceeding. The Court held that, although the petitioner was exonerated, it could keep jurisdiction to en-

16. *Id.* at 217–218, 47 S.Ct. at 360. *See Maryland Casualty Company v. Cushing,* 347 U.S. 409, 74 S.Ct. 608, 98 L.Ed. 806 (1954).

17. The Sixth Circuit has recently delineated the circumstances in which it is proper for parties to limitation proceedings to be allowed to invoke another court's jurisdiction:

"The district court, however, must dissolve a stay of proceedings and permit claimants to litigate their claims in alternative forums in two circumstances. First, if the limitation fund exceeds the aggregate of all claims, claimants must be permitted to proceed in other forums. *E.g., Lake Tankers Corp. v. Henn,* 354 U.S. 147 [77 S.Ct. 1269, 1 L.Ed.2d 1246] (1957); *In re Trinidad Corp.,* 229 F.2d 423, 428 (2d Cir.1955); *In re Moran Transport Corp.,* 185 F.2d 386 (2d Cir.1950), *cert. denied,* 340 U.S. 953 [71 S.Ct. 573, 95 L.Ed. 687] (1951) .... Second, if only one claim is made, regardless of its size in relation to the value of the limitation fund, the district court must dissolve its stay of other proceedings. *E.g., Ex Parte, Green,* 286 U.S. 437 [52 S.Ct. 602, 76 L.Ed. 1212] (1932); *Langnes v. Green,* 282 U.S. 531 [51 S.Ct. 243, 75 L.Ed. 520] (1931); *Great Lakes Dredge & Dock Co. v. Lynch,* 173 F.2d 281 (6th Cir.1949).... The district court, however, must ultimately decide whether the shipowner has a right to limitation of liability; the claimant may pursue his common law remedies in another forum only if he concedes that the district court has exclusive jurisdiction over the question of whether liability is limited." *S & E Shipping Corp. v. Chesapeake & Ohio Railway Co.,* 678 F.2d 636, 643 (6th Cir.1982) (citations omitted).

18. 354 U.S. 129, 77 S.Ct. 1103, 1 L.Ed.2d 1234 (1957).

19. *See id.* 354 U.S. at 142, 77 S.Ct. at 1110. In answering the respondent's argument that "dire consequences" would flow from exposing it to cross-claims, the Court commented, "Petitioner's theory makes the claimants no more than pawns in a game between the offending shipowners in which all that the claimants win after the successful battle is the right to fight another day for their due and in another court."

ter judgment on the cross-claim against the respondent, which had been found to be solely at fault. The federal court, sitting in admiralty, was held to have jurisdiction to settle all questions appropriate to the limitation proceeding, including the cross-claims of the passengers against the British shipowner, which would not have been before the court except by reason of its claim against the United States.

Referring to the equitable characteristics of the limitation of liability proceeding, the Court pointed out that it would be inequitable to subject the claimants to double litigation to achieve vindication of their rights:

"Logic and efficient judicial administration require that recovery against all parties at fault is as necessary to the claimants as is the fund which limited the liability of the initial petitioner. Otherwise this proceeding is but a 'water haul' for the claimants, a result completely out of character in admiralty practice." [20]

This principle of thrift, reason and fairness, which caused the Court in *British Transport* to eschew tying admiralty practice "to the mast of legal technicalities," [21] dictates that all claims in the present case be adjudicated in one action.

### C. Jury Trial

■ The defendant Tanner and several of the claimants demanded that the liability and damages issues in this case be tried by a jury. They argued that, although the jurisdiction of the court is founded in admiralty, they had a right to trial by jury at least on the cross-claims against Tanner, which but for this action could have been brought in a state court. They argued further that, since they had a constitutional right to a jury trial on those claims, judicial economy and efficiency required that all claims be tried to a jury.

The court held that these jury demands were not well founded and that all issues would be tried to the court sitting without a jury. Jurisdiction in this case is founded solely on admiralty. Not only is it an admiralty proceeding, but any other basis of jurisdiction is lacking. There is no right to trial by jury in admiralty cases:

"For reasons subsequently set out in detail, there is no constitutional right of trial by jury in cases that are properly within admiralty jurisdiction. Apart from the relatively unimportant right of jury trial accorded by 28 USC § 1873, dealing with admiralty cases arising upon the Great Lakes, no statutory enlargement of jury trial has occurred in admiralty and Rule 38(e) states specifically that the Rules are not to be construed as creating a right to a jury trial of issues in an admiralty or maritime claim within the meaning of Rule 9(h). Thus, when a claimant properly designates his claim as one in admiralty under Rule 9(h), there is no right to jury trial." [22]

■ Those parties demanding a jury trial conceded that the right to limitation or exoneration is properly tried to the court without a jury, but argued that they had a jury trial right on claims of a common law nature. Because historically juries have not been used in admiralty courts, and the Seventh Amendment adopts a historical approach, the court is of the belief that, if the claims are in this court solely by reason of its admiralty jurisdiction, a jury trial is not required.[23] This is true whether the issue for which jury trial is sought arises by way of an original claim, a counterclaim,[24] or a third-party claim.[25]

### D. Privity or Knowledge

■ Ashland admits that its employees at the Kenova facility placed a manifest on

**20.** *Id.* at 138, 77 S.Ct. at 1107–08.

**21.** *Id.* at 139, 77 S.Ct. at 1108.

**22.** 5 *Moore's Federal Practice* ¶ 38.35 (2d ed. 1982) (footnotes omitted).

**23.** *Green v. Ross,* 481 F.2d 102 (5th Cir.1973), *cert. denied,* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973); *Parsell v. Shell Oil Co.,* 421

F.Supp. 1275 (D.Conn.1976), *aff'd.,* 573 F.2d 1289 (2d Cir.1977).

**24.** *See Alaska Barite Company v. Freighters, Incorporated,* 54 F.R.D. 192 (N.D.Cal.1972).

**25.** *Cantey v. Flensburger Dampfercompagnie Harald Schuldt & Company,* 55 F.R.D. 127 (E.D.N.C.1971); *McCann v. Falgout Boat Company,* 44 F.R.D. 34 (S.D.Tex.1968).

the barge indicating that it was loaded with 4,014 barrels of premium gasoline, when in fact, as was more fully explained in the statement of facts above, the barge was loaded with some 4,300 barrels of premium gasoline. Ashland further claimed, however, that such an error did not amount to negligence, or if it was negligence, it was not the proximate cause of the disaster, because the custom and practice in the trade was to deal in very general approximations. Without further extending this opinion, it is sufficient to say that the court rejected this contention, finding that the error did amount to negligence and that the negligence was a direct and proximate cause of the overflow of the tank and the resulting conflagration. The evidence showed that the employees of Ashland and Tanner charged with the duty of unloading the barge did specifically rely on the manifest and would probably have been alerted to take sufficient precautions to have prevented the accident had they been advised of the true amount of gasoline in the premium gasoline compartment of the barge. Ashland initiated this action, seeking exoneration or limitation of liability. Once its employees were found negligent, it was no longer entitled to exoneration, though it was still eligible for limitation of liability. The right to limit liability, however, turned upon whether the negligence of Ashland's employees was with the company's privity or knowledge.[26] The court held that Ashland did have such privity or knowledge. This conclusion is required by numerous authorities.

Closely in point is the decision of the Supreme Court of the United States in the leading case of *Spencer Kellogg & Sons, Inc. v. Hicks*,[27] known familiarly as *The Linseed King* after the watercraft involved in the case. *The Linseed King* is particularly analogous to the case at bar because it too involved the application of the limita-

tion of liability doctrine to an accident on an inland river, rather than on some far-flung sea.

In *The Linseed King,* a corporation operating a factory on the New Jersey side of the Hudson River owned a launch which it used for ferrying employees to and from their work there, a distance of somewhat more than a mile. The launch was not seaworthy when ice was in the river, and the company had instructed the manager of the factory, who also controlled the use of the launch, not to allow it to be used when ice was, or was likely to be, present. Disobedience to these instructions, by the master of the launch, resulted in injuries to and the deaths of passengers. The Court held that, in view of the weather conditions and observation of ice in the river some days before, the manager should not have rested upon a mere instruction to the master not to run through ice, but should have assured himself by inquiry or personal investigation that the launch would not incur the hazard.[28] The Court further held that the factory manager enjoyed such a level of authority that his involvement in the negligence constituted privity or knowledge of the company.[29] The Court distinguished those cases in which the failure to obey instructions occurred on the high seas at a great distance from the corporate headquarters, where the management has no opportunity to control the operations of the vessel.[30]

The facts presently before the court make an even stronger case for finding the existence of privity or knowledge than those of *The Linseed King.* Here, the barge was unmanned and did not even have a master. The court finds that the position of Burke, the manager of Ashland's Kenova facility, was comparable to that of the factory manager in *The Linseed King.* The error that had occurred in loading the barge

---

26. "The liability of the owner of any vessel ... for any embezzlement, loss, or destruction ... done, occasioned, or incurred, without the privity or knowledge of such owner ... shall not ... exceed the amount or value of the interest of such owner ...." 46 U.S.C. § 183(a) (1976).

27. 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932).

28. *Id.* at 510, 52 S.Ct. at 452.

29. *Id.* at 511–12, 52 S.Ct. at 452–53.

30. *Id.* at 511, 52 S.Ct. at 452–53.

was reflected in paperwork that actually crossed Burke's desk, although after the barge had departed. Clearly his authority encompassed the right to control the entire loading operation, including the details both of loading the barge and unloading it at its destination.

■ In *The Linseed King,* the court made it "entirely clear that the shipowner was denied limitation not because of what [the manager] knew but because of what [he] ought to have found out." [31] Other cases establish that "knowledge means not only personal cognizance but also the means of knowledge—of which the owner or his superintendent is bound to avail himself." [32] As has been well stated by Judge Duniway of the Ninth Circuit Court of Appeals, "[A]n owner cannot close its eyes to what prudent inspection would disclose." [33] The facts in the case at bar reveal that Burke had the means of knowledge, of which he failed to avail himself, to discover and prevent the potential hazard. His position of authority makes his failure that of his employer, Ashland.

The court also finds particularly applicable the decision in *Avera v. Florida Towing Corporation.*[34] In that case, the owner of a tugboat company had reserved all hiring authority to himself. Nevertheless, without his knowledge or permission, the captain of one of his tugboats hired an underage seaman, who was severely injured in the course of performing work for which he was not sufficiently experienced. Asserting a limitation of liability claim, the corporate owner argued that, inasmuch as the captain had acted not only without the knowledge, but also against the specific directions of the management of this one-man corporation, there was no privity or knowledge.

The court rejected the contention. Emphasizing that the manager's office was located on property that included the dock to which the tug was moored, the court found the existence of privity or knowledge from the fact that the negligent hiring would have been disclosed by inquiries or personal inspection, or even contact with the tug by ship-to-shore radio after it had departed. The essence of the court's analysis focused on the obligation of the manager to investigate matters within his cognizance:

"Once we hold that Coppedge, as did Stover in Linseed King, had the duty of making inspection and inquiry, it follows without any question that through him the corporation is chargeable with privity and knowledge of Avera's incompetency and the tug master's negligence in taking him aboard as deckhand without first giving him adequate instruction .... [T]he fault in allowing Avera to sail with the tug and his injury occurring on the end of that voyage are all chargeable to the corporate shipowner as its acts done or omitted with its privity or knowledge." [35]

In the instant case, Burke's office was only about 300 feet from where the barge was loaded. The employees who loaded it operated under Burke's immediate direction and control. One of those employees also participated in unloading the barge. Although Burke was not present, he had the authority to control the employee at that time. By reason of these facts, this court held that Ashland, through Burke, its managing agent, had privity or knowledge of the negligence which caused this disaster.[36]

■ An additional ground for the court's finding is that the barge involved in this case was unseaworthy by reason of the

---

**31.** Black & Gilmore, *supra* note 1, at 888.

**32.** *The Cleveco,* 154 F.2d 605, 613 (6th Cir. 1946) (management charged with knowledge of top-heavy propensities of Great Lakes tugboat); *Great Atlantic & Pacific Tea Company v. Brasileiro,* 159 F.2d 661, 665 (2d Cir.1947), *cert. denied,* 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849 (1949).

**33.** *Waterman Steamship Corporation v. Gay Cottons,* 414 F.2d 724, 739 (9th Cir.1969).

**34.** 322 F.2d 155 (5th Cir.1963).

**35.** *Id.* at 166.

**36.** *See Complaint of Allied Towing Corporation,* 409 F.Supp. 180 (E.D.Va.1976), *aff'd. in part, vacated in part,* 580 F.2d 702 (4th Cir. 1978) (knowledge of supervisory employees is not limited to what they in fact know).

fact that the manifest which accompanied it did not correctly reflect the load.[37] There seems to be some conflict of authority as to whether or not unseaworthiness constitutes violation of a non-delegable duty, which automatically defeats the right to limitation of liability, or whether privity or knowledge of the unseaworthy condition must be shown.[38] It is unnecessary for the court to choose between these two tests, since both are satisfied in the case at bar. Ashland had privity or knowledge of the unseaworthy condition for the reasons discussed above.

## CONCLUSION

The outcome of the trial in the case at bar was the finding that the negligence of Ashland and that of Tanner were concurrent causes of the March 22, 1979, explosion. Ashland failed in its duty of care when, through its employees, it overlooked the line fill and pumped into the barge some 289 more barrels of gasoline than were reflected on the barge's manifest. Tanner's employees neglected to exhibit ordinary care in not monitoring the storage tank while it filled, in not knowing its capacity, and in not determining the remaining capacity by using strapping tables. Because the disaster occurred on Tanner's premises, of which Tanner had control and in the proper management of which it failed, the court found the majority of the fault to be Tanner's. Accordingly, Tanner was held liable for 70 percent and Ashland for 30 percent of the damages.

37. Improper loading of a vessel constitutes unseaworthiness. *Moore-McCormack Lines, Inc. v. Armco Steel Corporation,* 272 F.2d 873 (2d Cir.1959), *cert. denied,* 362 U.S. 990, 80 S.Ct. 1079, 4 L.Ed.2d 1023 (1960). *Cf. Trexler v. Tug Raven,* 290 F.Supp. 429 (E.D.Va.1968), *rev'd on other grounds,* 419 F.2d 536 (4th Cir.1969), *cert. denied,* 398 U.S. 938, 90 S.Ct. 1843, 26 L.Ed.2d 271 (1970); Black & Gilmore, *supra* note 1, at 894 n. 105s.

38. *Id.;* Comment, *The Role of Privity and Knowledge in the Shipowner's Limitation of Liability Act,* 23 Loyola L.Rev. 480 (1977). *See Trexler v. Tug Raven,* 290 F.Supp. at 442.