**Hugh R. MURPHY, a/k/a Red Murphy, Appellee,**

v.

**AMOCO PRODUCTION COMPANY, a corporation, Appellant.**

**No. 83–1533.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 14, 1983.

Decided March 6, 1984.

Michael J. Maus, Howe, Hardy, Galloway & Maus, P.C., Dickinson, N.D., for appellee.

Gary R. Wolberg, Bismarck, N.D., for appellant.

Robert O. Wefald, Atty. Gen., State of N.D., Lawrence Bender, Asst. Atty. Gen., North Dakota Indus. Com'n, Oil & Gas Div., Bismarck, N.D., for amicus curiae in support of appellee.

Before BRIGHT, JOHN R. GIBSON and FAGG, Circuit Judges.

BRIGHT, Circuit Judge.

Amoco Production Company appeals from a judgment of the district court[1] awarding Hugh R. Murphy damages and attorney fees under North Dakota's Oil and Gas Production Damage Compensation chapter, N.D.Cent.Code §§ 38–11.1–01—

---

1. The Honorable Bruce M. Van Sickle, United States District Judge for the District of North Dakota.

38–11.1–10 (1980).[2] Amoco challenges provisions of the chapter on both federal and state constitutional grounds. It contends that provisions of the chapter, as applied in this case, violate (1) the due process clause of the fourteenth amendment, (2) the impairment of contracts clause of Article I, (3) the just compensation clause of the fifth amendment, as it applies to the states through the fourteenth amendment, (4) the equal protection clause of the fourteenth amendment, and (5) sections 21 and 22 of Article I of the North Dakota Constitution.

Having considered Amoco's arguments, we hold that the challenged provisions of the chapter, as applied in this case, are constitutional. We further hold that the trial court did not err in refusing to submit Murphy's claim for punitive damages to the jury.

I. *Background.*

Hugh R. Murphy owns the surface rights, but not the mineral rights, to certain land in Dunn County, North Dakota. In 1975, before Murphy acquired the surface rights, the owner of the mineral rights leased the oil and gas rights to Frank J. Bavendick, who assigned them, also in 1975, to Amoco. The lease provided, among other things, that the lessee would pay the surface owner for any damage to crops or improvements that resulted from development of the land's oil and gas resources.

In April 1979, the North Dakota legislature enacted the Oil and Gas Production Damage Compensation chapter, which requires a mineral developer to

> pay the surface owner a sum of money equal to the amount of damages sustained by the surface owner for loss of agricultural production and income, lost land value, and lost value of improvements caused by drilling operations. [N.D.Cent.Code § 38–11.1–04.]

The statute commits the initial determination of the amount of damages to negotiation between the surface owner and the

mineral developer, *id.;* but if the surface owner is unwilling to accept the compensation the developer offers, the surface owner may sue, and if the court awards the surface owner more than the developer offered, the surface owner is entitled to costs and reasonable attorney fees. Section 38–11.1–09. The chapter took effect on July 1, 1979. Its provisions expressly allow compensation to surface owners even of land from which the mineral estate was separated before the enactment or effective date of the statute, so long as the development occurred after the effective date. Section 38–11.1–02.

On December 11, 1979 Amoco surveyed Murphy's land preliminary to establishing a well site, and Murphy gave consent for drilling. Before drilling began on February 13, 1980, Amoco unsuccessfully attempted to reach a settlement with Murphy over potential damages. The well proved unproductive and Amoco had it plugged. Murphy later notified Amoco, as required by section 38–11.1–07, of surface damage resulting from the drilling operations. Amoco offered $2,101.20 in settlement, as required by section 38–11.1–08. Murphy rejected the offer and brought suit under the compensation statute. The jury awarded Murphy $5,634.49 for lost agricultural production and $4,967.00 for lost land value. The district court entered judgment for the amount of the jury award plus $8,162.70 in costs and attorney fees, as authorized by section 38–11.1–09. Thereafter Amoco moved for judgment notwithstanding the verdict, alleging the unconstitutionality of the statutory provisions. The district court, 558 F.Supp. 591, denied the motion, and Amoco has timely appealed from the judgment, renewing its constitutional challenges.

II. *Discussion.*

A. *Due Process: The Police Power.*

In enacting the Oil and Gas Production Damage Compensation statute, the North Dakota legislature declared:

**2.** The legislature at its 1983 session enacted a number of minor amendments to chapter 38–11.1. The controversy before us, however, arose under the pre-amendment version of the chapter; accordingly, all references in this opinion are to that version.

1. It is necessary to exercise the police power of the state to protect the public welfare of North Dakota which is largely dependent on agriculture, and to protect the economic well-being of individuals engaged in agricultural production.

2. Exploration for and development of oil and gas reserves in this state interferes with the use, agricultural or otherwise, of the surface of certain land. [Section 38–11.1–01.]

Amoco challenges the validity of this exercise of the police power, citing *Euclid v. Ambler Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926), under which exercises of the police power are unconstitutional only if "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."

We cannot agree with Amoco that chapter 38–11.1 fails the *Ambler* test. Amoco does not challenge the legislature's findings that North Dakota's economy depends heavily on agriculture, and that oil and gas exploration interferes with the agricultural uses of land. Nor does Amoco dispute that a statute that preserved the state's agricultural productivity might thereby advance the public welfare. Amoco argues, rather, that because chapter 38–11.1 requires the payment of compensation to individual surface owners, it serves only private interests, not the public welfare. Amoco also argues that chapter 38–11.1 does not insure the preservation of agricultural productivity, because it does not require compensated surface owners to apply the damage payments they receive to the actual restoration of affected land or improvements.

 We regard Amoco's analysis as simplistic. First, the mere fact that a government act benefits a private party does not necessarily mean that it does not also advance the public welfare. The decision to build a public road, for example, may advance the public welfare even though it also benefits the contractors who are hired to build it and the property owners whose land becomes more valuable because the road makes it more accessible. Or, as in *Ambler* itself, zoning legislation may advance the safety, health, or welfare of the general public while also benefiting certain individuals by preserving or enhancing the value of their property (and disadvantaging other individuals by diminishing the value of their property). And where different persons have incompatible interests in the same property, the state can legitimately exercise its police power to protect the interest that matters most to the public welfare, even at the cost of an uncompensated destruction of other interests. *Miller v. Schoene*, 276 U.S. 272, 279–80, 48 S.Ct. 246, 247, 72 L.Ed. 568 (1928). The bare fact, therefore, that chapter 38–11.1 benefits certain surface owners, and disadvantages mineral developers, does not render it an invalid exercise of the police power.

 Nor does the absence of a requirement that compensated surface owners apply damage payments to restorative purposes render the statute incapable of advancing the public welfare. The requirement that mineral developers compensate surface owners for damage they cause may well serve as an incentive for developers not to drill, and thereby disrupt surface uses, where drilling is not likely to yield enough oil or gas to justify the loss to the economy from disruption of surface productivity. The compensation requirement might also create an incentive for developers not to cause unnecessary surface damage, and to remedy any damage—avoidable or unavoidable—they may cause without necessitating resort to the courts by surface owners suing under the terms of a lease or under the common law of negligence.[3] Although North Dakota has other

---

**3.** As with any shift from a negligence standard to strict liability, the public may benefit—through reduced aggregate dispute-resolution costs—from the substitution of a clear, uniform standard of liability for the difficulty and expense of determining negligence in countless individual instances. Indeed, the savings of resources that result from the adoption of a simplified rule may be a more compelling reason for its adoption than any change in substantive

laws requiring developers to perform certain reclamation procedures at drilling sites,[4] that consideration does not in any way diminish either the legislature's power to create inducements to lessen further the disruptive consequences of drilling, or the legitimacy or effectiveness of chapter 38–11.1 as a means of safeguarding surface uses.

In any event, this court need not evaluate the wisdom or effectiveness of the state's exercise of its police power. It is enough that the exercise aim at a legitimate goal, and that it bear a substantial relation to that goal. *Euclid v. Ambler, supra,* 272 U.S. at 395, 47 S.Ct. at 121.

We cannot say that the North Dakota damage compensation statute under challenge here is clearly arbitrary and unreasonable, or not substantially related to the general welfare. Therefore, we cannot say that it violates the due process clause, notwithstanding that it may benefit some surface owners at the expense of oil and gas developers, that it does not require surface owners to apply compensation payments to the restoration of damaged land or improvements, or that before the enactment of chapter 38–11.1 North Dakota already had laws in effect regulating oil and gas development.[5]

rights that results from the rule. At any rate, the fact that a change in a standard of liability will generally benefit plaintiffs while disadvantaging defendants, or vice versa, does not in itself necessarily render the change constitutionally infirm, or negate any public benefit that results from the change.

Prior to the enactment of chapter 38–11.1, North Dakota law subjected mineral developers to at least a duty of reasonableness regarding their treatment of the surface estate, and made them liable to the surface owner for damages resulting from negligence. *See Hunt Oil Co. v. Kerbaugh,* 283 N.W.2d 131, 134–35 (N.D.1979); *Feland v. Placid Oil Co.,* 171 N.W.2d 829, 834–35 (N.D.1969). Far from denying that the state could require a mineral developer to compensate a surface owner for damage to the surface estate resulting from the developer's negligence, Amoco in its brief endorses the reasonableness principle set forth in *Hunt Oil, supra,* and *Feland, supra.* But if the state can require developers to pay for the actual damage they cause through negligence, there is no inherent unconstitutionality in shifting from a negligence standard to a stricter form of liability. We emphasize that the statute in question neither requires a developer to pay for anything other than the *actual damage* to the surface estate which results from development, nor requires a developer to share any of the actual proceeds of mineral development with the surface owner. The statute merely adopts strict liability, in place of negligence, as the standard by which a developer's liability to an injured surface owner is determined.

Indeed, the North Dakota Supreme Court in *Hunt Oil, supra,* 283 N.W.2d at 135 n. 4, expressly reserved the question whether mineral developers should be held strictly liable for damage to the surface estate:

This case does not present, nor does this opinion decide, the issue of whether or not the owner or lessee of the mineral estate is liable for damages arising from the reasonably necessary use of the surface incident to the exploration, development, and transportation of the minerals. \* \* \* We question, however, the social desirability of a rule which potentially allows the damage or destruction of a surface estate equal or greater in value than the value of the mineral being extracted.

Future mineral exploration and development can be expected to expand as our demands for energy sources grow. Equity requires a closer examination of whether or not the cost of surface damage and destruction arising from mineral development should be borne by the owner of a severed surface estate or by the developer and consumer of the minerals. Although we do not doubt the mineral estate owner's right to use the surface estate to explore, develop and transport the minerals, we specifically do not decide if the right of reasonable use also implies the right to damage and destroy without compensation.

We do not think the legislature lacked the power to change the standard of liability. Moreover, Amoco had notice, before it ever undertook in late 1979 to develop the land in question, that it would be liable under chapter 38–11.1 to the surface owner for any damage it caused. Holding it to this statutory standard in this case is therefore not unfair or unduly harsh. Nor can Amoco claim that, because it acquired its estate in 1975 (before the enactment of chapter 38–11.1), it was forever immunized against the effect of any subsequent change the legislature might see fit to enact in the legal standard of liability governing the relationship between mineral owners and surface owners.

**4.** *See* N.D.Cent.Code § 38–08–04 and N.D.Adm. Code § 43–02–03–19.

**5.** This case is distinguishable from the other cases on which Amoco principally relies. In

## B. *Impairment of Contract.*

■ Amoco argues that chapter 38–11.1 violates the contract clause of the Constitution, which provides that, "No State shall * * * pass any * * * Law impairing the Obligation of Contracts." Though the language of this prohibition is absolute, the courts have not applied it literally. In particular, the courts have recognized that legitimate exercises of the police power which affect existing contracts do not necessarily violate the contract clause. *Allied Structural Steel v. Spannaus,* 438 U.S. 234, 241, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727 (1978); *Manigault v. Springs,* 199 U.S. 473, 480, 26 S.Ct. 127, 131, 50 L.Ed. 274 (1905).

In analyzing state laws that affect contracts, courts balance the severity of the impairment against the reasonableness and necessity of the state's exercise of its police power. *See Garris v. Hanover Ins. Co.,* 630 F.2d 1001 (4th Cir.1980). In this case, the effect of the statute on Amoco's obligations under the lease is slight. The lease made Amoco strictly liable for any damages to crops or to improvements which resulted from drilling operations. Moreover, existing state law obligated lessees to pay for any damages to the surface estate resulting from negligence. *See supra* note 3. Thus the only additional liability to which the statute subjected Amoco in this case was the obligation to compensate Murphy for losses in the value of the land which resulted from reasonable (that is, non-negligent) drilling activities. The jury

determined that Amoco's operations diminished the value of the land by $4,967.00; it made no findings as to how much, if any, of this loss was attributable to negligence on Amoco's part. But given the enormous costs of oil and gas exploration—acquisition of mineral rights, surveying, construction of access roads, drilling itself, the reclamation required by other provisions of state law, and the compensation to the surface owner already required under the lease and under the negligence standard— we can hardly regard the additional liability imposed by chapter 38–11.1 as a severe impairment of Amoco's contractual rights. Given the insignificance of the impairment, the reasonableness and necessity of the legislation need not be strictly scrutinized. *Garris v. Hanover Ins. Co., supra,* 630 F.2d at 1005–06. Moreover, Amoco has not even attempted to rebut the legislature's findings that agricultural production is critical to the public welfare in North Dakota, and that oil and gas development seriously threatens the state's agricultural economy. Therefore, we cannot, on this record, hold that chapter 38–11.1 works so severe an impairment of Amoco's contract rights as to override the public purposes that the statute serves.

Moreover, it is at least arguable that the damage compensation requirement does not impair Amoco's contractual rights at all. Though the lease specifically provides that the lessee compensate the surface owner for any damage to crops or improve-

*Department for Natural Resources v. No. 8 Ltd. of Va.,* 528 S.W.2d 684 (Ky.1975), the court struck down a state statute which gave the surface owner power to *veto* mineral development by the mineral rights owner. The North Dakota statute contains no such provision; it requires only notice to the surface owner, a very different thing from a requirement that the surface owner consent before the minerals may be extracted.

Similarly, *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), is distinguishable from this case. There, the statute effectively rendered the mineral estate completely worthless, by categorically forbidding the extraction of coal where it would result in ground subsidence. The North Dakota statute does not forbid mineral developers to do any-

thing they might otherwise do; it only requires them to compensate surface owners for damage they cause, a burden that Amoco has not shown to be unreasonable or tantamount to an expunction of all its rights in the property. In *Mahon,* moreover, the deed by which the surface owners acquired their rights expressly waived any claim for damages that might arise from extraction of the coal. The lease in this case, far from containing any waiver of damages, actually provides that the mineral lessee compensate the surface owner for damage to crops or to improvements. The only addition the statute makes to the damages to which Murphy would be entitled under the lease is compensation for lost land value. Thus both the statute and the lease in this case differ in crucial respects from those in *Mahon.*

ments that results from mineral development, the lease says nothing to suggest that those are the only elements of damages to which the surface owner is entitled. That is, the lease does not contain a waiver by the surface owner of any additional rights he might have under state tort law. Amoco concedes as much when it admits that, even in the absence of chapter 38–11.-1, it would be liable under state tort law to the surface owner for harm that resulted from any unreasonable use it might make of the surface estate. The elements of damages enumerated in the lease therefore do not constitute a limitation on the surface owner's right to recovery. Rather, the surface owner is entitled to what the lease provides, *plus* whatever else state tort law provides.

Furthermore, nothing in the lease purports to vary the general principle that the law as it stands at the time of a tortious occurrence governs the parties' liabilities for that tort (even assuming that the parties had the power by private agreement so to provide). The fair implication from the lease itself, then, is that the surface owner is entitled to whatever damages state tort law might provide as of the time mineral development actually occurs, in addition to the contractually-provided compensation for damage to crops and improvements. The enactment of chapter 38–11.1 changed state tort law, but it did not in any way affect the lessee's liability respecting the only two elements of damages to which the lease itself actually spoke—damage to crops and damage to improvements. The enactment of chapter 38–11.1 thus worked no impairment of any right or obligation arising from the lease itself. It merely changed state tort law, from which the parties to the lease never purported to exempt themselves.

We conclude, therefore, that the enactment of chapter 38–11.1 either did not impair any rights under the lease at all, or, if it did, did not rise to the level of a constitutional violation under the standard set forth in *Allied Structural Steel v. Spannaus, supra.*

C. *Taking Without Just Compensation.*

■ Amoco contends that, by requiring mineral developers to compensate surface owners for damage to the surface estate, North Dakota takes private property for public use without just compensation.[6]

We reject this contention. The damage compensation statute arguably does not "take" anything from Amoco. Under the statute, mineral owners still own what they owned before its enactment, and remain as free to develop their property as they were previously (subject only to the reasonable and unburdensome requirement that they notify the surface owner before they begin development). The requirement that Amoco pay the surface owner for the damage that Amoco itself actually causes to the surface estate does not amount to a governmental taking of private property for public use at all. If it did, then any new rule of state law requiring a tortfeasor to compensate those he harms would constitute a taking in violation of the fifth and fourteenth amendments.

Even if the right to damage the surface estate without compensating the surface owner is fairly characterizable as "property" of the mineral owner, a legislative enactment abolishing that right does not amount to a compensable taking. "[W]here an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–327, 62 L.Ed.2d 210 (1979). Here, Amoco's right not to compensate Murphy for unavoidable damage to Murphy's surface estate, if indeed it is "property" at all, amounts to only a minor strand in the full bundle of rights which constitutes Amoco's mineral estate. *See Chicago, Burlington & Quincy Ry. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).

---

6. The fifth amendment's prohibition on such takings applies to the states through the due process clause of the fourteenth amendment.

The legislative modification of that "right" does not violate the constitutional prohibition on uncompensated takings.

### D. Equal Protection and State Constitutional Claims.

■ Amoco contends that chapter 38–11.1 violates its fourteenth amendment right to the equal protection of the laws. Amoco objects to three specific features of the statute: (1) it applies to oil and gas developers, but not to developers of such other minerals as coal and uranium; (2) it subjects developers, but not lessors and other royalty owners, to the damage compensation obligation; and (3) it requires defendant developers, but not plaintiff surface owners, to pay costs and attorney fees in certain circumstances. Amoco concedes that none of these features of the statute creates a suspect classification requiring strict judicial scrutiny of the statute's means and ends. Rather, the statute meets the federal constitutional standard if the distinctions it draws rest upon some rational basis. *See Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979); *U.S. v. Carolene Products Co.*, 304 U.S. 144, 152, 58 S.Ct. 778, 783, 82 L.Ed. 1234 (1938).

Amoco also challenges the statute under sections 21 and 22 of Article I of the North Dakota Constitution.[7] Amoco argues, citing *Herman v. Magnuson*, 277 N.W.2d 445 (N.D.1979), *Arneson v. Olson*, 270 N.W.2d 125 (N.D.1978), and *Johnson v. Hassett*, 217 N.W.2d 771 (N.D.1974), that the North Dakota Supreme Court would uphold chapter 38–11.1 under the state constitution only if it detected a "close correspondence between statutory classification and legislative goals." *Johnson v. Hassett, supra*, 217 N.W.2d at 775, *quoting The Supreme Court, 1972 Term*, 87 Harv.L.Rev. 55, 121 (1973).

We need not decide whether the North Dakota courts would analyze the statute under the "close correspondence" test or under the less exacting "rational basis" test, for we think the statutory classifications satisfy either test, and thus offend neither the state nor the federal Constitution. As for the contention that the legislature has unfairly singled out oil and gas developers, we note that the Surface Owner Protection Act, N.D.Cent.Code §§ 38–18–01—38–18–08, imposes a similar surface-owner compensation requirement on coal developers. Apart from coal and oil and gas, no other mineral development poses a significant present threat to agriculture in North Dakota. The legislature's decision to enact statutes regulating these varieties of mineral development, but not others, therefore has a rational basis, closely corresponds to the goal of protecting surface uses from uncompensated disruption, and violates neither the equal protection clause nor sections 21 or 22 of Article I of the North Dakota Constitution.

Likewise, the legislature's imposition of damage liability on developers, but not on lessors or royalty owners, meets the constitutional standards. The developers are the persons who actually cause the disruption of the surface estate which the statute aims to deter or remedy. It clearly serves the declared purposes of the statute to impose liability on those whose actions actually threaten the surface estate, and not on others who may have a pecuniary interest in the minerals produced but who play no role in the development itself.

Finally, the imposition of attorney fees and costs on the developer, but not on the surface owner, satisfies the rational basis and close correspondence requirements. The whole statutory scheme aims at negotiated settlements of surface damage claims: section 38–11.1–04 authorizes the parties to determine compensation by a formula agreed to in advance of development, and section 38–11.1–08 *requires* the developer

---

7. Section 21 provides,

No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens.

Section 22 provides,

All laws of a general nature shall have a uniform operation.

to make an offer of settlement in response to any notification of injury from the surface owner. In a great many cases, then, the operation of the statute will result in the compensation of the surface owner without any lawsuit ever having to be filed. The attorney fees and costs provision, section 38–11.1–09, imposes fees and costs on the developer only if, after the surface owner rejects the developer's settlement offer as inadequate and brings suit, the court awards the surface owner more in damages than the developer offered in settlement. The fees and costs provision creates a clear incentive for the developer to offer the surface owner a fair settlement, thereby avoiding unnecessary litigation and the attendant costs to both the surface owner and the judicial system. We cannot say that the legislature's careful design to encourage nonlitigated settlements, of which the fees and costs provision is a part, lacks a rational basis. We conclude, moreover, that the classification the provision creates closely corresponds to the legislature's permissible goal of protecting surface uses with as little resort to the courts as necessary. Therefore we cannot hold the provision in violation of the equal protection guaranty or of sections 21 and 22 of Article I of the state Constitution.

Accordingly, we hold that none of the challenged classifications under chapter 38–11.1 violates either the equal protection clause or the relevant portions of the North Dakota Constitution.

### E. *Punitive Damages.*

■ On appeal, Murphy contends that the trial court erred in refusing to submit to the jury his claim for punitive damages.

Murphy bases his claim on a memorandum sent by an Amoco attorney to another Amoco employee, in which the attorney expressed his belief that chapter 38–11.1 is unconstitutional and recommended that Amoco not comply with it. The trial court ruled this memorandum inadmissible on grounds of attorney-client privilege.

North Dakota law allows an award of punitive damages only where the plaintiff shows "oppression, fraud, or malice." N.D.Cent.Code § 32–03–07. We think the Amoco internal memorandum shows that Amoco knowingly failed to comply with chapter 38–11.1, but we do not think that failure rises to the level of oppression, fraud, or malice. Murphy has pointed to no case, nor does our review of North Dakota precedent reveal any, in which a defendant has been assessed punitive damages for failure to comply with a statute which he believes in good faith to be unconstitutional. Nor did Amoco's actions irrevocably prejudice Murphy's interests; though Amoco did not give Murphy written notice of its commencement of development on the Murphy property, as required by the statute, Murphy had actual notice of Amoco's activities from the very beginning.[8] Thus, quite apart from the admissibility of the memorandum—an issue we need not reach—we think Murphy has failed to make out a claim for punitive damages under North Dakota law. Therefore we cannot say the trial court erred in refusing to submit the punitive damages issue to the jury.

### III. *Conclusion.*

We hold chapter 38–11.1, as applied in this case, constitutional. We further hold

---

**8.** Irrevocable prejudice to property rights with lack of notice to the plaintiff seems to lie at the heart of the two cases on which Murphy principally relies. In *Mahanna v. Westland Oil Co.,* 107 N.W.2d 353 (N.D.1960),. the court sustained an award of punitive damages against defendants who repossessed and immediately resold trucks belonging to the plaintiff, in knowing violation of a statute requiring a seller who repossesses property to give notice of the repossession and to hold the property for fifteen days, during which the person from whom the property was repossessed has the right to re-

deem it. In *Wilson v. City of Eagan,* 297 N.W.2d 146 (Minn.1980), the court sustained an award of punitive damages against two city officials who impounded and then intentionally killed the plaintiff's cat, in violation of a statutory requirement that impounded animals be held for at least five days for redemption by the owner.

We think these cases have little relevance to the case before us now. In any event, they hardly establish Murphy's right, in this case, to have his claim for punitive damages submitted to the jury.

that the trial court did not err in refusing to submit to the jury Murphy's punitive damages claims. We affirm the judgment of the district court.