SALVATORE PALUMBO vs. BOSTON TOW BOAT CO., INC.,
& another.

Suffolk. December 6, 1985. — January 13, 1986.

Present: GRANT, CUTTER, & ARMSTRONG, JJ.

*Admiralty. Admiralty Extension Act.*

In an action by the owner of a restaurant against the owner of a vessel and
the operator of four tow boats accompanying the vessel when it struck
and damaged a bridge, seeking damages for loss of business sustained
when the bridge was closed for repairs for a year and a half, resulting
in loss of access to the restaurant by its customers, the judge properly
entered summary judgment for the defendants on the ground that under
the Admiralty Extension Act, 46 U.S.C. § 740 (1982), the claim was
governed by admiralty law rather than the common law of the State,
and that under admiralty law recovery for purely economic loss is not
permitted if the plaintiff has suffered no injury to his person or property.
[414-418]

CIVIL ACTION commenced in the Superior Court Department
on May 27, 1983.

Motions for summary judgment were heard by *James P.
McGuire*, J.

*Jeffrey Mickelson* for the plaintiff.
*John J. Finn* for Boston Tow Boat Co., Inc.
*Dexter L. Kenfield* for Cyclamen Shipping Corp.

ARMSTRONG, J. The plaintiff's business, B & B Restaurant,
located at the foot of the Chelsea Street bridge in Chelsea,
was forced to close for lack of customers after a vessel owned
by the defendant Cyclamen Shipping Corp. and accompanied
by four tow boats operated by the defendant Boston Tow Boat
Co., Inc., struck and damaged the bridge, causing it to be
closed for repairs for a year and a half. The plaintiff filed a
complaint seeking compensation for his economic losses, bas-
ing his claim on the principle of Massachusetts law, enunciated
in *Stop & Shop Cos.* v. *Fisher,* 387 Mass. 889, 896 (1983),

that "an established business may state a claim in nuisance for severe economic harm resulting from loss of access to its premises by its customers." Judgment was entered for the defendants under Mass.R.Civ.P. 56, 365 Mass. 824 (1974), and the plaintiff appealed.

It is not disputed that the defendants' vessels were traversing navigable waters; that the Federal courts would have jurisdiction of the claim under 46 U.S.C. § 740 (1982) (Admiralty Extension Act of 1948, 62 Stat. 496); that the Superior Court has jurisdiction of the claim under the "saving to suitors" clause of 28 U.S.C. § 1333 (1982); or that the substantive law to be applied in the State court is that which would be applied if the case had been brought in the Admiralty Court. *Moore-McCormack Lines, Inc.* v. *Amirault,* 202 F.2d 893, 896-897 (1st Cir. 1953). Gilmore & Black, Admiralty 50 (2d ed. 1975). It also is not disputed that, if the law to be applied is general maritime, or admiralty law, recovery in the circumstances is not permitted for purely economic loss where the plaintiff has suffered no injury to his person or property. See *Robins Dry Dock & Repair Co.* v. *Flint,* 275 U.S. 303 (1927); *Kinsman Transit Co.* v. *Buffalo,* 388 F.2d 821 (2d Cir. 1968); *Burgess* v. *M/V Tamano,* 370 F. Supp. 247, 250-251 (D. Me. 1973), affirmed, 559 F.2d 1200 (1st Cir. 1977); *Louisiana ex rel. Guste* v. *M/V Testbank,* 752 F.2d 1019 (5th Cir. 1985); *Barber Lines* v. *M/V Donau Maru,* 764 F.2d 50 (1st Cir. 1985). The question, then, is whether the claim is governed by Massachusetts law or by the general maritime law.[1]

Prior to the Admiralty Extension Act, the general rule was that ship-to-shore tort claims were not maritime claims cognizable in the Admiralty Courts but were, instead, common law claims triable in the State courts (or in the Federal District Courts under, e.g., diversity jurisdiction) and governed by State law. *The Admiral Peoples,* 295 U.S. 649, 651 (1935). *Wiper* v. *Great Lakes Engr. Works,* 340 F.2d 727, 730 (1965). Gilmore & Black, at 522-523. Bridges, wharves, and the like

---

[1] The question whether Massachusetts or general maritime law applied was not argued and was expressly passed without decision in the *Stop & Shop* case, 387 Mass. at 899.

were considered extensions of land. *Cleveland Terminal &
Valley R.R.* v. *Cleveland S.S. Co.,* 208 U.S. 316, 320-321
(1908). *Nacirema Operating Co.* v. *Johnson,* 396 U.S. 212,
214, 215 (1969). *Victory Carriers, Inc.* v. *Law,* 404 U.S. 202,
206-207 (1971). The "locality" of the tort, upon which admi-
ralty jurisdiction depended, *Executive Jet Aviation, Inc.* v.
*Cleveland,* 409 U.S. 249, 253-254 (1972), was the place where
the "'substance and consummation' of the harm took place."
Gilmore, at 522, quoting from *The Plymouth,* 70 U.S. (3 Wall.)
20, 33 (1865). Here, the tort sued for was consummated on
land, i.e., by the injury to the bridge, from which the plaintiff's
damages flowed.

The Admiralty Extension Act extended admiralty jurisdiction
to cover "all cases of damage or injury, to person or property,
caused by a vessel on navigable water, notwithstanding that
such damage or injury be done or consummated on land." We
need not consider whether it would be possible theoretically
to construe the Act so as to give the Admiralty Court jurisdiction
without altering the applicable law (thus, for example, giving
the owner of a damaged bridge or wharf the benefit of the in
rem action in admiralty with principles of liability governed
as formerly by State law). It is quite clear from the legislative
history that the central purpose of the Act was to eliminate the
anomalous and unfair results that could and did flow from
adjudicating the cross claims in collision cases according to
different and conflicting legal principles. See Sen. Rep. No.
1593, 80th Cong., 2d Sess., reprinted in 1948 U.S. Code
Cong. & Ad. News 1898.[2] 7A Moore's Federal Practice par.
.325[4], at 3580-3581 (2d ed. 1983). Thus, many cases have
implied (and some have explicitly stated) that a claim cogniz-

---

[2] Where the purpose of the Act is in part explained as follows: "As a
result of the denial of admiralty jurisdiction in cases where injury is done
on land, when a vessel collides with a bridge through mutual fault and both
are damaged, under existing law the owner of the bridge, being denied a
remedy in admiralty, is barred by contributory negligence from any recovery
in an action at law. But the owner of the vessel may by a suit in admiralty
recover half damages from the bridge, contributory negligence operating
merely to reduce the recovery. . . . The bill under consideration would
correct these inequities."

able in the Admiralty Court by virtue of the Amiralty Extension Act is governed by the general maritime law. *Gutierrez* v. *Waterman S.S. Corp.*, 373 U.S. 206, 209-210 (1963) (unseaworthiness claim by longshoreman injured on dock). *Victory Carriers, Inc.* v. *Law,* 404 U.S. at 208-211. *Empire Seafoods, Inc.* v. *Anderson,* 398 F.2d 204, 212 (5th Cir. 1968). *Pryor* v. *American President Lines,* 520 F.2d 974, 979-980 (4th Cir. 1975). *New York Trap Rack Corp.* v. *Red Star Towing & Transp. Co.,* 172 F. Supp. 638, 646 (S.D.N.Y. 1959). *Fematt* v. *Los Angeles,* 196 F. Supp. 89 (S.D. Cal. 1961). *Seaboard Air Line R.R.* v. *Marine Indus., Inc.,* 237 F. Supp. 10, 11-12 (E.D. S.C. 1964). *Adams* v. *Harris County,* 316 F. Supp. 938, 945 (S.D. Tex. 1970). *C.F. Rule Constr. Co.* v. *Cumberland River Sand Co.,* 204 Tenn. 378, 383-385 (1959). Gilmore & Black, *supra* at 523.

*Askew* v. *American Waterways Operators, Inc.,* 411 U.S. 325 (1973), upon which the plaintiff relies, sustained the validity of Florida legislation imposing strict liability, for both cleanup costs and damages, in cases of oil spills on its territorial waters. There are passages in that opinion which, when read in isolation from the body of ship-to-shore collision cases before and after the passage of the Admiralty Extension Act, would seem to support the plaintiff's position that State law controls in the absence of direct conflict with the Federal State law.[3] Although the *Askew* decision could have been rested narrowly on a provision of the Federal Water Quality Improvement Act of 1970, 84 Stat. 91, 33 U.S.C. § 1161(o) (1970), which made explicit that Federal policy was to permit States to legislate with respect to oil spills in their territorial waters, the decision was more broadly put in terms that vindicated "the police power of the States over oil spillage." *Id.,* at 328. We think the *Askew* case was probably intended as a specific response to the unique and alarming problems of pollution in

---

[3] Most particularly, this passage at 344: "But we decline to move the *Jensen* [*Southern Pac. Co.* v. *Jensen,* 244 U.S. 205 (1917)] line of cases shoreward to oust state law from situations involving shoreside injuries by ships on navigable waters. The Admiralty Extension Act does not pre-empt state law in those situations."

coastal waters. Other Federal decisions dealing with oil spills have shown a tendency to broaden the range of tort liability under the general maritime law to cover, in such instances, some indirect economic losses, particularly those of commercial fishermen. See *Burgess* v. *M/V Tamano,* 370 F. Supp. at 248-250; *Union Oil Co.* v. *Oppen,* 501 F.2d 558, 563-571 (9th Cir. 1974); *Marine Nav. Sulphur Carriers, Inc.* v. *Lone Star Indus.,* 638 F.2d 700 (4th Cir. 1981); *Louisiana ex rel. Guste* v. *M/V Testbank,* 752 F.2d 1026-1027, & n.10. The present case, however, deals with the principles governing liability for collisions between vessels and land-based structures. It is clear that it was the central purpose of the Admiralty Extension Act to bring all claims in such situations under the uniform application of the general maritime law. To read the *Askew* case as the plaintiff does would defeat that purpose.

*Judgment affirmed.*