**In re the EXXON VALDEZ.**

**No. A89–095 Civ.**

United States District Court, D. Alaska.

Feb. 8, 1991.

Lloyd Benton Miller, Anchorage, Alaska.

Douglas Serdahely, Anchorage, Alaska.

David Ruskin, Anchorage, Alaska.

## ORDER NO. 38

HOLLAND, Chief Judge.

### ALYESKA'S MOTION FOR JUDGMENT ON THE PLEADINGS

Alyeska's [1] motion for judgment on the pleadings was brought, pursuant to Rule 12(c), Federal Rules of Civil Procedure, on the ground that certain identified claims for economic losses made by certain identified plaintiffs should be dismissed because those plaintiffs did not complain of any physical impact or injury from the oil on their person or property, as required by maritime law and the rule in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). The plaintiffs targeted by the motion are: (i) area businesses, such as boat charters, taxidermists, and fishing lodges; (ii) those with use and enjoyment claims, such as sport fishermen, photographers, and kayakers; and (iii) fish processors and fish tenders.

■ *Robins Dry Dock* established that in those situations where negligence does not result in any physical harm, thereby providing no basis for an independent tort, and only pecuniary loss is suffered, a plaintiff may not recover for the loss of the financial benefits of a contract or prospective trade. *Getty Refining & Marketing Co. v. MT FADI B,* 766 F.2d 829, 833 (3d Cir.1985). The *Robins Dry Dock* rule is well established maritime law. *See Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019, 1032 (5th Cir.1985), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986); *Getty Refining,* 766 F.2d at 833; *see also,* Owen, *Recovery for Economic Loss Under U.S. Maritime Law: Sixty Years Under Robins Dry Dock,* 18 J.Mar.L. & Com. 157 (1987).

The Ninth Circuit, however, has eroded the "bright-line" rule of *Robins Dry Dock* by creating a limited exception to the requirement for physical harm for commercial fishermen. *See Carbone v. Ursich,* 209 F.2d 178, 181–182 (9th Cir.1953) (held that crew members of fishing vessel could recover lost profits from owners of another vessel that negligently fouled their nets); *Union Oil Co. v. Oppen,* 501 F.2d 558, 570 (9th Cir.1974) (held that commercial fishermen whose harvests were depleted by an oil spill could recover lost profits from defendant oil company in negligence action); *Emerson G.M. Diesel, Inc. v. Alaskan Enterprise,* 732 F.2d 1468, 1475 (9th Cir.1984) (held that economic losses such as lost profits and repair expenses were recoverable in manufacturer's strict liability admiralty action involving commercial fishing vessel).

### MARITIME TORT

■ Alyeska characterizes the oil spill from the *Exxon Valdez* as a classic maritime tort. Whether the court is indeed faced with a maritime tort is a determination crucial to the final resolution of the motion for judgment on the pleadings. If the oil spill is not a maritime tort, then the maritime rule in *Robins Dry Dock* will not apply.

A tort falls under admiralty jurisdiction if it meets both the "locality" and the "maritime nexus" requirements which the courts have imposed. Claims satisfy the locality requirement if the wrong occurred on the high seas or navigable waters. *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 863–864, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986). Here, the wrong was the damage which occurred on or in the navigable waters and which was caused by the oil spilling from the *Exxon Valdez,* grounded in navigable waters. The locality requirement is met.

---

1. Collective reference to: Alyeska Pipeline Service Co. (D–3), Amerada Hess Pipeline Corp. (D–11), Arco Pipe Line Co. (D–12), BP Pipelines (Alaska), Inc. (D–19), Mobil Alaska Pipeline Co. (D–14), Phillips Alaska Pipeline Corp. (D–20), Unocal Pipeline Co. (D–21), and George M. Nelson (D–9).

Claims meet the maritime nexus requirement if the wrong bears "a significant relationship to traditional maritime activity." *Executive Jet Aviation, Inc. v. Cleveland,* 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972). The *Exxon Valdez* was engaged in maritime commerce, specifically the transport of oil in a ship, when the accident occurred. Maritime commerce is the primary focus of admiralty law. *East River,* 476 U.S. at 864, 106 S.Ct. at 2298. Therefore, the maritime nexus test is also met.

Since both tests are met for those claims for damages which occurred in or on navigable waters, the oil spill is a maritime tort subject to admiralty jurisdiction. Factual development of the claims will probably establish that the claims of the sport fishermen, kayakers, and fish tenders, who are targeted by Alyeska's motion, are for damages which occurred in or on the navigable waters.

■ However, a large portion of the claims are for damages that occurred on land, such as the claims of shoreside businesses and fish processors. Historically, damages to the shore or to shore facilities were not cognizable in admiralty. *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 340, 93 S.Ct. 1590, 1599, 36 L.Ed.2d 280 (1973). In 1948, Congress remedied that inequity by enacting the Admiralty Extension Act, 46 U.S.C. § 740, which states, in pertinent part, as follows:

> The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damages or injury, to person or property, *caused by a vessel on navigable water,* notwithstanding that such damage or injury be done or consummated on land.

(Emphasis added.) A ship or its appurtenances must proximately cause an injury on shore to invoke the Admiralty Extension Act and the application of maritime law. *Pryor v. American President Lines,* 520 F.2d 974, 979 (4th Cir.1975), *cert. denied,* 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976); *see Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019, 1031 (5th Cir. 1985), *cert. denied,* 477 U.S. 903, 106 S.Ct.

3271, 91 L.Ed.2d 562 (1986) (Under Admiralty Extension Act, admiralty jurisdiction extends to claims for shoreside damages resulting from chemical spill caused by collision of ships on navigable waterway.). Factual development will probably establish that the oil spill from the *Exxon Valdez* was the proximate cause of the shore-based damage claims, thereby subjecting them to admiralty jurisdiction pursuant to the Admiralty Extension Act.

Oil spills from vessels on navigable waters have consistently been held to be maritime torts by other courts. *See In re Oil Spill by Amoco Cadiz,* 699 F.2d 909, 913 (7th Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 172 (1983) (Shipwreck on the high seas is quintessentially the kind of incident for which the distinctive doctrines and remedies of admiralty law were designed; any doubt created by the fact that the damage occurred on land is removed by the Admiralty Extension Act.); *United States v. M/V Big Sam,* 681 F.2d 432, 440 (5th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983) (Oil spill which resulted from collision between tug and tanker barge on navigable waters is maritime tort.); *In re Oswego Barge Corp.,* 664 F.2d 327, 334 (2d Cir.1981) (Negligent conduct causing loss to others, such as when a vessel discharges oil into navigable waters, constitutes a traditional maritime tort.); *Puerto Rico v. SS Zoe Colocotroni,* 628 F.2d 652, 672 (1st Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981) ("An oil spill on the navigable waters is a breach of federal maritime law."); *United States v. Bear Marine Service,* 509 F.Supp. 710, 717 (E.D.La.1980) ("The discharge of oil into navigable waters is a maritime tort."); *Burgess v. M/V Tamano,* 370 F.Supp. 247, 249 (D.Me.1973) (An oil spill occurring in Maine's coastal waters constitutes a maritime tort and is within the admiralty jurisdiction.); *California ex rel. Dept. of Fish & Game v. S.S. Bournemouth,* 307 F.Supp. 922, 926 (C.D.Cal.1969) (Oil pollution of navigable waters is a maritime tort.)

The issue of whether the oil spill constitutes a maritime tort is directly raised by

the amended and consolidated class action complaint[2] which alleges the maritime torts of unseaworthiness and maritime negligence. The claims of fourteen of the plaintiffs targeted by Alyeska's motion are included in the amended and consolidated class action complaint. One other complaint[3] filed by plaintiffs targeted by Alyeska's motion also raises the issue by alleging a claim under "maritime liability".

Basically, the oil spill caused by the *Exxon Valdez* is a maritime tort. Whether any particular claim falls under admiralty jurisdiction is a question of fact as to whether damages occurred on or off shore, and if damages were on shore, whether those damages were proximately caused by the grounding of the *Exxon Valdez*. Subject to the necessary factual development, the specific claims targeted by Alyeska's motion were caused by a maritime tort and appear to be under admiralty jurisdiction even though none of the plaintiffs have expressly invoked admiralty jurisdiction.

## APPLICATION OF MARITIME LAW

The claims on which Alyeska presently seeks judgment in this court are generally based on state law concepts of negligence, nuisance, misrepresentation, and tortious interference with contractual expectancies, as well as strict liability under AS 46.03.-822.[4] A determination that the oil spill is a maritime tort affects the substantive law applied to the case.

■ If a cause of action is asserted which is based on a maritime tort, the substantive law applied is maritime law. *Jansson v. Swedish American Line*, 185 F.2d 212, 216 (1st Cir.1950).

**2.** Clerk's Docket No. 377.

**3.** Clerk's Docket No. 60 (A89–140 Civil).

**4.** In its motion, Alyeska neither refers to the strict liability under the Trans–Alaska Pipeline Authorization Act, 43 U.S.C. §§ 1651–1655, nor addresses the "notwithstanding the provisions of any other law" language contained in § 1653(c)(1). This court recently ruled in *Glacier Bay* that the *Robins Dry Dock* rule does not limit claims under TAPAA. *In re the Glacier Bay*, 746 F.Supp. 1379, 1391 (D.Alaska 1990)

[W]hen a common law action is brought, whether in a state or in a federal court, to enforce a cause of action cognizable in admiralty, the substantive law to be applied is the same as would be applied by an admiralty court—that is, the general maritime law, as developed and declared, in the last analysis, by the Supreme Court of the United States, or as modified from time to time by act of Congress.

*Id.* (citing to *Chelentis v. Luckenbach Steamship Co.*, 247 U.S. 372, 382, 38 S.Ct. 501, 503, 62 L.Ed. 1171 (1918)).

■ The "saving to suitors" clause in 28 U.S.C. § 1333[5] does not affect the application of substantive maritime law.

[T]he "saving to suitors" clause allows state courts to entertain *in personam* maritime causes of action, but in such cases the extent to which state law may be used to remedy maritime injuries is constrained by a so-called "reverse-*Erie*" doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards.

*Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 222–223, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986). Under the "saving to suitors" clause a right or claim sanctioned by maritime law may be enforced through any appropriate remedy recognized at law, but the plaintiff does not have an election to have the defendant's liability measured by common-law standards rather than those of maritime law. *Chelentis v. Luckenbach Steamship Co.*, 247 U.S. 372, 384, 38 S.Ct. 501, 504, 62 L.Ed. 1171 (1918).

(Order on Phase I Motions and Motions to Dismiss (Clerk's Docket No. 685)).

**5.** 28 U.S.C. § 1333 (emphasis added):
The district courts shall have original jurisdiction, exclusive of the courts of the States, of:
(1) Any civil case of admiralty or maritime jurisdiction, *saving to suitors in all cases all other remedies to which they are otherwise entitled.*
(2) Any prize brought into the United States and all proceedings for the condemnation of property taken as prize.

At least as to the claims for damages from the *Exxon Valdez* oil spill which occurred in or on navigable waters, it does not matter that plaintiffs characterized their claims in terms of state law; federal maritime law is controlling. *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 409, 74 S.Ct. 202, 204, 98 L.Ed. 143 (1953); *see Hess v. United States*, 361 U.S. 314, 318 n. 7, 80 S.Ct. 341, 345 n. 7, 4 L.Ed.2d 305 (1960). (In action brought under Oregon wrongful death statute, court stated: "There can be no question but that Oregon would be required to apply maritime law ... since a tort action for injury or death occurring upon navigable waters is within the exclusive reach of maritime law.") In order to preserve uniformity, maritime law must be applied to torts cognizable under admiralty jurisdiction regardless of how plaintiffs characterize the tort under common-law. Uniformity is the justification for exclusive federal admiralty jurisdiction. *Hall v. Zambelli*, 675 F.Supp. 1023, 1025 (S.D.W.Va.1988).

■ As to claims for shoreside damages caused by the oil spill from the *Exxon Valdez*, the issue of applicable law is more complex.

In straightforward fact situations involving common-law claims, other courts have applied the *Robins Dry Dock* rule to deny claims of shoreside businesses for purely economic loss. *See Global Petroleum Corp. v. Northeast Petroleum*, 405 Mass. 187, 539 N.E.2d 1022, 1024 (1989) (Riverfront business which suffered purely economic losses when retaining wall collapsed into river and blocked navigation, could not recover business losses merely by re-characterizing federal maritime claims as ones arising under state nuisance law); *Palumbo v. Boston Tow Boat Co.*, 21 Mass.App. Ct. 414, 487 N.E.2d 546 (1986) (*Robins Dry Dock* applied to restaurant owner's state court claim for purely economic loss arising after vessel struck bridge, forcing restaurant to close for lack of customers while bridge was being repaired).

The court concludes that general maritime law, including the rule in *Robins Dry Dock*, applies to the tort claims pleaded in this case, except for those based on a theory of strict liability.

Both Congress and the State of Alaska have enacted legislation in the area of strict liability. Congress enacted the Trans–Alaska Pipeline Authorization Act (TAPAA), 43 U.S.C. §§ 1651–1655, which provides for strict liability for oil spills in § 1653(c). The State of Alaska enacted AS 46.03.822 ("Alaska Act") which provides for strict liability for any oil spills, including spills of oil that has been transported through the trans-Alaska pipeline.

■ The Alaska Act is a valid exercise of the state's police power in that it attempts to protect the safety of its citizens, their property, and the state's natural resources by regulating the release of hazardous substances. *See Murphy v. Amoco Production Co.*, 729 F.2d 552, 555–556 (8th Cir. 1984) (State statute requiring oil and gas developers to pay surface owners for damages caused by drilling operations was not an invalid exercise of police power in that it benefitted surface owners, where it also benefitted public interest in protecting agricultural uses of land.). The Supreme Court ruled, in *Askew v. American Waterways Operators, Inc.*, that sea-to-shore pollution was within the reach of a state's police power, and that even though Congress may have acted in the admiralty area, state regulation was permissible absent a clear conflict with the federal law. *Askew v. American Waterways Operators, Inc.* 411 U.S. 325, 341 & 343, 93 S.Ct. 1590, 1600 & 1601, 36 L.Ed.2d 280 (1973) (Florida Oil Spill Prevention & Pollution Control Act which imposed strict liability for the benefit of the state and private individuals was held not to have invaded regulatory area preempted by federal Water Quality Improvement Act which was concerned solely with recovery of actual cleanup costs incurred by the federal government).

■ In exercising their police power, the states may act in maritime areas concurrently with the federal government. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442, 80 S.Ct. 813, 815, 4 L.Ed.2d 852 (1960). Evenhanded local regulation to effectuate a legitimate

local public interest is valid unless preempted by federal action or unduly burdensome on maritime activities. *Id.* at 442–443, 80 S.Ct. at 815. The issue then raised is whether the Alaska Act conflicts with the rule in *Robins Dry Dock* or with TAPAA which is not limited by *Robins Dry Dock.*

■ When Congress enacted TAPAA, Congress spoke directly to the issue of TAPS oil spills. TAPAA imposes strict liability "notwithstanding the provisions of any other law" to the extent of $100 million. 43 U.S.C. § 1653(c). Therefore, to the extent of its coverage, TAPAA, as specific federal maritime legislation, displaces the general maritime law, including the rule of *Robins Dry Dock,* regarding strict liability.

The Alaska Act is similar to TAPAA in that it imposes strict liability for oil spills "notwithstanding any other provision or rule of law." AS 46.03.822. Unlike TAPAA, the Alaska Act provides for unlimited strict liability.

In the limited situation such as this case where the oil spill was of TAPS oil, the Alaska Act and TAPAA do not conflict to the extent of $100 million. For the first $100 million of damage resulting from a TAPS oil spill, the remedy would be uniform whether claims were brought under TAPAA or the Alaska Act.[6] A conflict does not surface until a TAPS oil spill exceeds $100 million in damages.

■ *Robins Dry Dock* applies to the claims under the Alaska Act to the extent that damages claimed are in excess of liability imposed by TAPAA because general maritime law would be the applicable law. State law may supplement federal maritime law, such as in the exercise of a state's police power, but state law may not conflict with federal maritime law, as it would be redefining the requirements or limits of a remedy available at admiralty. *Powell v. Offshore Navigation, Inc.,* 644 F.2d 1063, 1065 n. 5 (5th Cir.), *cert. denied,* 454 U.S. 972, 102 S.Ct. 521, 70 L.Ed.2d 391 (1981);

*accord Continental Oil Co. v. Bonanza Corp.,* 677 F.2d 455, 461 n. 7 (5th Cir.1982), *vacated on other grounds,* 706 F.2d 1365 (5th Cir.1983) ("When admiralty law speaks to a question, state law cannot override it."). The Alaska Act's "notwithstanding" clause would not be effective to avoid federal law of which the limitations of *Robins Dry Dock* are a part.

TAPAA § 1653(c)(9) does not alter this result. Section 1653(c)(9) states:

(9) This subsection shall not be interpreted to preempt the field of strict liability or to preclude any State from imposing additional requirements.

Section 1653(c)(9) contains no language which could be interpreted as relieving the states from the limits imposed by maritime law. It simply states that the field of strict liability is not preempted. Thus the State of Alaska may enact laws in the area of strict liability with its police power so long as they are consistent with other applicable federal law. *See Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 341, 93 S.Ct. 1590, 1600, 36 L.Ed.2d 280 (1973).

■ Section 1653(c)(9) cannot be read as an implied grant of permission to the states to legislate in derogation of general maritime law even though the TAPAA conference report states as follows:

The States are expressly not precluded from setting higher limits or from legislating in any manner not inconsistent with the provisions of this Act.

H.R.Conf.Rep. No. 624, 93d Cong., 1st Sess., *reprinted in* 1973 U.S.Code Cong. & Admin.News 2417, 2531. Congress' power to legislate concerning rights and liabilities within the maritime jurisdiction and remedies for their enforcement arises from the Constitution and is nondelegable. *Knickerbocker Ice Co. v. Stewart,* 253 U.S. 149, 164, 40 S.Ct. 438, 441, 64 L.Ed. 834 (1920) (Amendment to "saving to suitors" clause which preserved state workmen's compensation remedies in cases under admiralty jurisdiction was held ineffective.).

---

**6.** This was essentially the ruling in *Glacier Bay.* The court did not elaborate on the basis for that ruling because the parties in *Glacier Bay* represented to the court that damages did not exceed $100 million.

The subject [admiralty] was intrusted to it to be dealt with according to its discretion—not for delegation to others. To say that because Congress could have enacted a compensation act applicable to maritime injuries, it could authorize the States to do so as they might desire, is false reasoning. Moreover, such an authorization would inevitably destroy the harmony and uniformity which the Constitution not only contemplated but actually established—it would defeat the very purpose of the grant.

*Id.* Congress may have intended for the states to be able to simply extend the strict liability provisions of TAPAA to higher limits without subjecting those higher limits to *Robins Dry Dock,* but Congress did not specifically do so,[7] nor did it have the authority to grant the states permission to do so. *Robins Dry Dock* applies to limit the damages recoverable under the Alaska Act in excess of the $100 million recoverable under TAPAA.

The inroads that the Ninth Circuit has made on the application of *Robins Dry Dock* do not necessarily diminish the impact of the rule on the plaintiffs targeted by Alyeska's motion. The most recent Ninth Circuit decision on recovery of economic losses was in *Emerson G.M. Diesel, Inc. v. Alaskan Enterprise,* 732 F.2d 1468 (9th Cir.1984), a products liability action in which the court allowed recovery for purely economic losses. That decision was essentially emasculated two years later when the Supreme Court ruled in *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 876, 106 S.Ct. 2295, 2304, 90 L.Ed.2d 865 (1986): "Thus whether stated in negligence or strict liability, no products-liability claim lies in admiralty when the only injury claimed is economic loss."

The next most recent Ninth Circuit decision on this subject was in *Union Oil Co.* *v. Oppen,* 501 F.2d 558 (9th Cir.1974), which allowed recovery of lost profits by commercial fishermen whose harvests were depleted by the Santa Barbara oil spill. That decision was limited as follows:

Finally, it must be understood that our holding in this case does not open the door to claims that may be asserted by those, other than commercial fishermen, whose economic or personal affairs were discommoded by the oil spill of January 28, 1969.... Nothing said in this opinion is intended to suggest, for example, that every decline in the general commercial activity of every business in the Santa Barbara area following the occurrences of 1969 constitutes a legally cognizable injury for which the defendants may be responsible. The plaintiffs in the present action lawfully and directly make use of a resource of the area, *viz.* its fish, in the ordinary course of their business.

*Id.* at 570. The result in *Oppen* was criticized in the dissent to *Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019 (5th Cir.1985) (en banc; 10–5 decision), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986).

*Oppen* allowed the fishermen to recover ... but the opinion fails to draw a very convincing line between the rights of fishermen and the rights of others who draw their living from the water. Certainly the injury from the oil spill to others who make their living upon the water, such as boat charterers who are unable to put to sea, is as foreseeable and as direct as the injury to the fishermen. It is therefore unclear why these parties should not also be entitled to recovery. The court did attempt to distinguish fishermen in that they "lawfully and directly make use of a resource of the sea, *viz.* its fish, in the ordinary course of their business". *Id.* at 570.

---

7. In TAPAA § 1653(c)(1), Congress provided that "[n]otwithstanding the provisions of any other law" the vessel owner/operator and the Trans–Alaska Pipeline Fund "shall be strictly liable without regard to fault *in accordance with the provisions of this subsection*" (emphasis added). Subsection 1653(c)(3) then provides that strict liability "shall not exceed $100,000,000." If Congress had written subsection 1653(c)(3) to say that there would only be $100 million collected by the Fund to pay claims, rather than saying strict liability was limited to $100 million, the result here would be different.

Yet, if those who make use of a "resource of the sea" are entitled to recovery, then it seems *a fortiori* that those who make use of the sea itself in their business—a boat charterer, for example—would be entitled to recovery. Nor can *Oppen's* restricted recovery be explained in terms of special property rights in the fish. No one owns a wild animal, or fish, until achieving capture, and under this rule, the fishermen had no rights to the fish superior to those of Union Oil.

*Id.* at 1044 n. 23 (Wisdom, J., dissenting). As the dissent points out, the exception to *Robins Dry Dock* is arbitrary. *Id.* It offers no guidance in distinguishing which of those plaintiffs targeted by Alyeska's motion might fit within its protection.

## CONCLUSION

The oil spill from the *Exxon Valdez* gives rise to a maritime tort. Therefore, all tort claims, except for those for strict liability, must be decided under general maritime law, which includes the rule in *Robins Dry Dock.*

The Alaska Act is technically not preempted by TAPAA to the extent of TAPAA's $100 million liability because the remedy is uniform whether a claim is brought under either the Alaska Act or TAPAA. *Robins Dry Dock* will only apply to those claims under the Alaska Act which exceed TAPAA's $100 million liability. However, in practical application, it would be unworkable to allow strict liability claims for the initial $100 million to proceed under both acts and in both this court and the Superior Court for the State of Alaska. While TAPAA provides a mechanism to gather all the claims and fairly prorate them to meet its $100 million liability limits, the Alaska Act has no such mechanism. It was in part this concern which brought the court to endeavor to the extent it could to require all potential TAPAA claimants to file with the Fund. In that fashion, all claimants would be before one claims processing agency—the entity that has the $100 million to pay against all claims, inclusive of purely economic losses. It was also out of concern for such individual claims,

including economic loss claims, that the court previously urged that the United States Government and the State of Alaska refrain from making claims against the Fund. These governmental entities have other remedies available to them. The inclusion of those governmental claims against the Fund would drastically draw down the fund when it is allocated on a *pro rata* basis amongst all claimants. 43 U.S.C. § 1653(c)(3). The *pro rata* payment out of the Fund is particularly acute for plaintiffs whose claims are not viable because of the rule in *Robins Dry Dock* once the statutory $100 million limit for strict liability is exceeded.

It is the court's perception that Congress may very well not have perceived the possibility of the situation which has developed here. Congress may have assumed that $100 million was more than enough to cover any oil spill. It is now entirely clear that if such were the perception of Congress, it was tragically wrong. We must all now do the best we can to accommodate the present situation to TAPAA as it was written. It is the court's conclusion that such a goal will best be achieved by the prompt submission of all private claims to the Fund for adjustment and the withholding of claims by governmental entities which have other statutory remedies available to them. In this fashion, the recovery for private claimants who have suffered economic losses will be maximized.

Since factual development regarding the individual claims of the targeted plaintiffs is necessary before judgment could be entered on any plaintiff's claim, Alyeska's motion for judgment on the pleadings cannot be granted as to any specific party; however, the foregoing shall be the law of this case as to all parties.

## CERTIFICATION

Interlocutory decisions such as that embodied in this order may be appealed to the Ninth Circuit Court of Appeals if the criteria set forth in 28 U.S.C. § 1292(b) are met.

The status of the *Robins Dry Dock* rule, in view of the decisions of the Ninth Circuit

Court of Appeals, especially *Union Oil v. Oppen*, 501 F.2d 558 (9th Cir.1974), and the within order presents "a controlling question of law as to which there is substantial ground for difference of opinion...." 28 U.S.C. § 1292(b). Despite the express disclaimer in *Oppen* of any intention to disavow *Robins Dry Dock* except for commercial fishermen, this court does not understand how, as a matter of principle, the rule in *Robins Dry Dock* can have application for all claimants who suffer economic loss as a result of a marine tort except commercial fishermen. If the court of appeals were to have second thoughts about its decision in *Oppen* as a consequence of the United States Supreme Court decision in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the implications of such a change of direction in this case would be of monumental proportions. The court assumes without knowing that there are thousands of commercial fishermen's claims involved in this litigation. Even if *Oppen* remains the law of the Ninth Circuit, this court and the Superior Court for the State of Alaska are confronted with a substantial number of economic loss claims. This court and, since it is bound to follow federal admiralty law as well, the Superior Court of the State of Alaska urgently need to know whether and to what extent the rule of *Robins Dry Dock* will apply to the economic claims of those who are not commercial fishermen.

Plainly a decision on this issue will substantially expedite disposition of a substantial segment of the multiplicity of claims brought against the defendants in this litigation. Equally important to this court, an early ruling on the foregoing issue will allow all viable claims to proceed simultaneously and therefore most efficiently.

The Ninth Circuit Court of Appeals is urged to take this matter up immediately, to order a substantially foreshortened briefing schedule, and to render a prompt decision.